# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

FS MEDICAL SUPPLIES, LLC,

      Plaintiff,

v.

TANNERGAP, INC. *et al.*,

      Defendants.

Civil Action No.
3:25-cv-00102-UJ1-WCM

---

## OMNIBUS MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND FOR JUDGMENT ON THE PLEADINGS

**ARNOLD & PORTER
  KAYE SCHOLER LLP**
250 W 55th Street
New York, NY 10019
212-836-8000
kent.yalowitz@arnoldporter.com
carmela.romeo@arnoldporter.com


  – and –

**ARNOLD & PORTER
  KAYE SCHOLER LLP**
1144 Fifteenth Street, Suite 3100
Denver, CO 80202
303-863-1000
eliseo.puig@arnoldporter.com

April 10, 2025

**MAYNARD NEXSEN PC**
227 W. Trade Street, Suite 2300
Charlotte, NC 28202
Telephone: (704) 339-0304
lerwin@maynardnexsen.com
dluzum@maynardnexsen.com
kzhao@maynardnexsen.com

*Counsel for Plaintiff*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 2

PROCEDURAL HISTORY ................................................................................ 4

ARGUMENT ....................................................................................................... 6

   I.  The Court Has Subject-Matter Jurisdiction ..................................... 6

      A. FSMS Was Not "Made Or Joined To Invoke The Jurisdiction"
         Of The Court ........................................................................... 7

      B. FSMS Did Not Act Improperly or Collusively ...................... 12

   II.  The Action Is Timely ...................................................................... 21

      A. There Is No Statute Of Limitations Bar ................................. 21

      B. There Is No Statute Of Repose Bar ........................................ 27

   III. FSMS States A UDTPA Claim ...................................................... 31

      A. Defendants Fraudulently Stripped TPUK Of Its Assets ......... 31

      B. Defendants Delivered The Distribution Agreement To FSMS
         With No Intent To Perform ...................................................... 33

   IV. FSMS States Voidable Transfer Claims Against TPUK ............... 42

CONCLUSION .................................................................................................. 43

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACS Partners, LLC v. Americon Group, Inc.*,
2010 WL 883663, at *9 (W.D.N.C. Mar. 5, 2010) ...........................................32

*Aikens v. Ingram*,
524 F. App'x 873 (4th Cir. 2013)....................................................23, 25, 27

*Airlines Reporting Corp. v. S & N Travel, Inc.*,
58 F.3d 857 (2d Cir. 1995) .........................................................................11

*Ambrosia Coal and Const. Co. v. Pages Morales*,
482 F.3d 1309 (11th Cir. 2007) ...................................................................18

*American Pipe & Constr. Co. v. Utah*,
414 U.S. 538 (1974)....................................................................................30

*Arku v. Wells Fargo Bank, N.A.*,
621 F. Supp. 3d 602 (W.D.N.C. 2022).........................................................34

*Bishop v. Hendricks*,
495 F.2d 289 (4th Cir. 1974) ..............................................................14, 17

*Blackmon v. Holder*,
2024 WL 4156826 (E.D.N.C. Sept. 11, 2024) ..............................................27

*Bowser v. DeJoy*,
2024 WL 1809509 (W.D.N.C. Apr. 24, 2024)................................................28

*Branson Label, Inc. v. City of Branson, Mo.*,
793 F.3d 910 (8th Cir. 2015) ..............................................................10, 11

*Bugsby Prop. LLC v. Alexandria Real Est. Equities, Inc.*,
2020 WL 1974147 (S.D.N.Y. Apr. 24, 2020) ................................................11

*California Pub. Employees' Ret. Sys. ("CalPERS") v. ANZ Sec., Inc.*,
582 U.S. 497 (2017)....................................................................................30

*Carl Rose & Sons Ready Mix Concrete, Inc. v. Thorp Sales Corp.*,
36 N.C. App. 778 (1978) .............................................................................22

*Castillo Grand, LLC v. Sheraton Operating Corp.*,
719 F.3d 120 (2d Cir. 2013) ..........................................................................*passim*

*Castillo Grand, LLC v. Sheraton Operating Corp.*,
2009 WL 4667104 (S.D.N.Y. Dec. 9, 2009) ......................................................8

*Clark v. Velsicol Chem. Corp.*,
110 N.C. App. 803 (1993), *aff'd*, 336 N.C. 599 (1994) ..............................*passim*

*Clark v. Velsicol Chem. Corp.*,
944 F.2d 196 (4th Cir. 1991) ............................................................................24

*Cross v. Allen*,
141 U.S. 528 (1891)....................................................................................15, 17

*Devonwood-Loch Lomond Lake Ass'n v. City of Fayetteville*,
908 S.E.2d 66 (N.C. Ct. App. 2024)..................................................................22

*Dutcher v. Eastburn*,
2011 WL 1134666 (E.D.N.C. Mar. 26, 2011)...................................................23

*E.I. DuPont D Nemours & Co. v. Agfa NV*,
2019 WL 279989 (E.D. Va. Jan 22, 2019)........................................................17

*Eastern Shore Mkts. v. J.D. Assoc. Ltd. P'ship*,
213 F.3d 175 (4th Cir. 2000) ............................................................................28

*Ehmann v. Meflow*,
2022 NCBC 55, 2022 WL 4462356 (N.C. Super. Ct. Sept. 12, 2022) ........32, 42

*Farmington Village Corp. v. Pillsbury*,
114 U.S. 138 (1885)..........................................................................................13

*Fleming v. Horner*,
2022 NCBC 26, 2022 WL 1655493 (Bus. Court Mecklenburg Cty.
May 24, 2022) ...................................................................................................32

*Gaines v. City of New York*,
215 N.Y. 533, 109 N.E. 594 (1915) ..................................................................25

*General Technology Applications, Inc. v. Exro Ltda*,
388 F.3d 114 (4th Cir. 2004) ..............................................................................7

*Gilbane Bldg. Co. v. Fed. Rsrv. Bank of Richmond, Charlotte Branch*,
   80 F.3d 895 (4th Cir. 1996) ...................................................................33

*Grupo Dataflux v. Atlas Global Group, L.P.*,
   541 U.S. 567 (2004).......................................................................10, 20

*Gulf Fleet Tiger Acquisition, L.L.C. v. Thoma-Sea Ship Builders, L.L.C.*,
   282 F.R.D. 146 (E.D. La. 2012) .........................................................11

*Haux v. Gerson (In re Gerson)*,
   35 B.R. 129 (B.A.P. 9th Cir. 1983) ....................................................42

*Hayden v. Manning*,
   106 U.S. 586 (1883)............................................................................13

*Herzog Contracting Corporation v. McGowan*,
   976 F.2d 1062 (7th Cir. 1992) ...........................................................18

*Hongda Chem USA, LLC v. Shangyu Sunfit Chem. Co., Ltd.*,
   2016 WL 4703725 (M.D.N.C. Sept. 8, 2016) ....................................33

*Housecalls Home Health Care, Inc. v. State, Dep't of Health & Hum. Servs.*,
   200 N.C. App. 66 (2009) (Geer, J., concurring)................................22

*Huang v. Ziko*,
   132 N.C. App. 358 (1999) ............................................................22, 26

*In re Bestwall LLC*,
   71 F.4th 168 (4th Cir. 2023) .........................................................12, 14

*In re Seneca Investments LLC*,
   970 A.2d 259 (Del. Ch. 2008) ............................................................20

*Interstate Narrow Fabrics, Inc. v. Century USA, Inc.*,
   218 F.R.D. 455 (M.D.N.C. 2003)..................................................33, 40

*KB Aircraft Acquisition, LLC v. Berry*,
   249 N.C. App. 74 (2016) ....................................................................28

*Kramer v. Caribbean Mills, Inc.*,
   394 U.S. 823 (1969).................................................................*passim*

iv

*KRG New Hill Place, LLC v. Springs Invs., LLC*,
    2015 NCBC 69, 2015 WL 4113368 (Bus. Court Wake Cty. July 8, 2015) ......32

*Lawrence v. Cooper*,
    2009 WL 10703082 (E.D.N.C. Nov. 24, 2009) ................................................23

*Lee v. City of Fayetteville*,
    2017 WL 2274970 (E.D.N.C. May 24, 2017) ..................................................25

*Lehigh Mining & Mf'g Co. v. Kelly*,
    160 U.S. 327 (1895)........................................................................................9

*Lester v. McFaddon*,
    415 F.2d 1101 (4th Cir. 1969) ..............................................................*passim*

*Lincoln Property Co. v. Roche*,
    546 U.S. 81 (2005)...........................................................................................7

*Little v. Giles*,
    118 U.S. 596 (1886)........................................................................................13

*Long & Foster Real Estate, Inc. v. NRT Mid-Atlantic, Inc.*,
    357 F. Supp. 2d 911 (E.D. Va. 2005) ........................................................18, 19

*Long v. Fink*,
    80 N.C. App. 482 (1986) ...............................................................................22

*Magill v. Gulf & Western Indus.*,
    736 F.2d 976 (4th Cir. 1984) .........................................................................35

*McCauley v. Thomas*,
    242 N.C. App. 82 (2015) ...............................................................................22

*McCullough v. Branch Banking & Tr. Co.*,
    844 F. Supp. 258 (E.D.N.C. 1993) ................................................................23

*Miller v. Perry*,
    456 F.2d 63 (4th Cir. 1972) ...........................................................................14

*Movement Mortg. LLC v. Summit Funding, Inc.*, 2024 WL 57341,
    (W.D.N.C. Jan. 4, 2024) ................................................................................35

*Nolan v. Boeing Co.*,
    919 F.2d 1058 (5th Cir. 1990) ...........................................................................13

*Pasquotank Action Council, Inc. v. City of Virginia Beach*,
    909 F. Supp. 376 (E.D. Va. 1995) ......................................................................18

*Pearce v. N. Carolina State Highway Patrol Voluntary Pledge
    Comm.*,
    310 N.C. 445 (1984) ...........................................................................................28

*Peter Marco, LLC v. Banc of Am. Merch. Servs., LLC*,
    660 F. Supp. 3d 453 (W.D.N.C. 2023) ................................................................34

*Price v. Deal*,
    2014 WL 3547367 (W.D.N.C. July 17, 2014) .....................................................25

*Prudential Oil Corp. v. Phillips Petroleum Co.*,
    546 F.2d 469 (2d Cir. 1976) .........................................................................10, 11

*Rainsdon v. Kirtland (In re Kirtland)*,
    2011 WL 4621959 (Bankr. D. Idaho Sept. 30, 2011) .........................................42

*Renegar v. R.J. Reynolds Tobacco Co.*,
    145 N.C. App. 78 (2001) .....................................................................................27

*Republican Party of N.C. v. Martin*,
    980 F.2d 943 (4th Cir. 1992) ..............................................................................28

*Roth v. Northern Assurance Co.*,
    32 Ill. 2d 40, 203 N.E.2d 415 (1964) .................................................................25

*S.C. Dep't of Disabilities & Special Needs v. Hoover Universal, Inc.*,
    535 F.3d 300 (4th Cir. 2008) ..............................................................................25

*Shamis v. Ambassador Factors Corp.*,
    1997 WL 473577 (S.D.N.Y. Aug. 18, 1997) ......................................................11

*Shearin v. Lloyd*,
    246 N.C. 363, 98 S.E.2d 508 (1957) .............................................................28, 29

*Sheraton Operating Corp. v. Castillo Grand, LLC*,
    34 Misc. 3d 1207(A), 943 N.Y.S.2d 794 (Sup. Ct. Westchester County 2011) ..8

*Shofer v. Hack Co.*,
970 F.2d 1316 (4th Cir. 1992) ........................................................25, 26

*Simpson v. Air Liquide Am., LP*,
2009 WL 2171274 (W.D.N.C. July 20, 2009) ...................................21

*South Dakota v. North Carolina*,
192 U.S. 286 (1904)........................................................................15, 19

*Swan Racing Co., LLC v. XXXtreme Motorsport, LLC*,
2015 WL 4430257 (W.D.N.C. July 20, 2015) .............................33, 34

*TaiDoc Tech. Corp. v. OK Biotech Co.*,
2016 NCBC 26., 2016 WL 1221425 (N.C. Super. Mar. 28, 2016)........23, 26, 27

*Tee Feral Golf, LLC v. MJM Golf, LLC*,
No. 21-1648, 2022 WL 17546943 (4th Cir. Dec. 9, 2022) ................14

*Torres v. Parkview Foods*,
468 N.E.2d 580 (Ind. Ct. App. 1984) .........................................24, 25

*Toste Farm Corp. v. Hadbury, Inc.*,
70 F.3d 640 (1st Cir. 1995)...........................................................10, 11

*Town of Pineville v. Atkinson/Dyer/Watson Architects, P.A.*,
114 N.C. App. 497 (1994) ................................................................27

*Turnbull v. Ross*,
141 F. 649 (4th Cir. 1905) ................................................................14

*United Labs., Inc. v. Kuykendall*,
335 N.C. 183 (1993) .........................................................................35

*Varghese v. China Shenghuo Pharmaceutical Holdings, Inc.*,
672 F. Supp. 2d 596 (S.D.N.Y. 2009) ..............................................28

*Vaughan v. Southern Ry. Co.*,
542 F.2d 641 (4th Cir. 1976) ............................................................14

*Ward v. Lyall*,
125 N.C. App. 732 (1997) ...........................................................22, 26

*Warren v. Snowshoe LTC Grp., LLC,*
    293 N.C. App. 174 (2024) ...................................................................29

*Williams v. Nottawa,*
    104 U.S. 209 (1881).............................................................10, 11, 13

*Williamson v. Osenton,*
    232 U.S. 619 (1914)..........................................................................16

*Wilson v. McAleer,*
    368 F. Supp. 2d 472 (M.D.N.C. 2005) .............................................34

## **Statutes**

28 U.S.C. § 1291 ....................................................................................26

28 U.S.C. § 1332 ................................................................................7, 10

28 U.S.C. § 1359 ...........................................................................*passim*

Act of March 3, 1875, § 5, 18 Stat. 470................................................17

California Family Code § 850 ...............................................................19

N.C. Gen. Stat. § 75–1.1 .......................................................................35

N.C. Gen. Stat. § 39-23.7 ......................................................................42

N.C. Gen. Stat. § 39-23.9..................................................27, 28, 39, 30

## **Other Authorities**

13F *Wright & Miller's Fed. Prac. & Proc. Juris.* § 3638 (3d ed.) .........16

13F *Wright & Miller's Fed. Prac. & Proc. Juris.* § 3639 (3d ed.) .........16

15A *Moore's Fed. Prac.—Civ.* § 102.19 (2025) ...................................16

Fed. R. Civ. P. 1 ....................................................................................20

Fed. R. Civ. P. 54 ..................................................................................26

N.C. R. Civ. P. 41 ..................................................................................24

*Moore's Judicial Code Commentary* ¶ 0.03(27) (1949) .......................17

## INTRODUCTION

Defendants are mounting another attempt to avoid a judgment on the merits of the parties' dispute. Their wish to avoid trial is understandable. Discovery has unmasked an unscrupulous course of conduct in which Defendants prized greed over integrity, lied to their business partner, and concocted a deceptive scheme to avoid paying their partner the 50/50 profit split they promised. Discovery has also revealed damages in the hundreds of millions of dollars.

The Court again faces a multiplicity of motions to dismiss: subject-matter jurisdiction in *Tanner I* and *II*; subject matter jurisdiction in the current case; statute of limitations by all Defendants; and a motion by Tanner directed to the UDTPA claim and the fraudulent conveyance claim. (Mr. Bourne has answered and did not move to dismiss the UDTPA claim except on statute of limitations grounds.) These motions do not hold water.

*First*, Defendants' most recent subject-matter motion is meritless, because the statute they invoke, 28 U.S.C. § 1359, only applies if a party is "made or joined to invoke the jurisdiction" of a federal court, and neither happened here. In addition, the charge of improper and collusive behavior is unsustainable under Supreme Court and Fourth Circuit law. This Court has subject-matter jurisdiction.

*Second*, North Carolina law (applicable in this diversity case) firmly establishes that this action is timely because it was filed when the same claims were

"alive" in *Tanner I* and *II*. The leading case is *Clark v. Velsicol Chem. Corp.*, 110 N.C. App. 803, 808 (1993), *aff'd*, 336 N.C. 599 (1994), in which the court stated: "we hold that filing an action in federal court which is based on state substantive law *does* toll the statute of limitations while that action is pending." *Id.* (emphasis added).

*Third*, as Defendants all but concede, FSMS has stated a viable UDTPA claim because Defendants stripped TPUK of its assets with intent to hinder, delay, and defraud FSMS. Mr. Bourne does not even move against the substance of the UDTPA claim. Tanner attempts to defeat it by ignoring the new evidence of asset stripping as well as evidence, developed in discovery, that Tanner entered into the Distribution Agreement on September 14, 2020, intending not to perform it. The extensive and specifically pled facts show that Tanner planned to breach the Distribution Agreement before it was delivered, and indeed breached the contract only one day later. These allegations (based on new evidence) are facts from which a jury could infer that Tanner never intended to perform specific promises in the Distribution Agreement. For both reasons, FSMS states a plausible UDTPA claim.

*Finally*, Tanner's request that the Court release it from the fraudulent conveyance claim is not only meritless, but inconsistent with its promise, made in response to a request for an injunction, not to distribute assets without leave of this Court.

## BACKGROUND

The Court has previously summarized the background of this case. It arises

2

from a contractual relationship between FS Medical Supplies, LLC ("FSMS"), Tanner-GAP, Inc., and Tanner Pharma UK Limited ("TPUK" and, together with Tanner-GAP, Inc., "Tanner"), formed in the early days of the COVID-19 pandemic. Order at 1 (Sept. 30, 2023), ECF 117 (No. 21-cv-501). Seeking a mutually beneficial arrangement when supply chains were limited and relationships were valuable, the parties entered into two agreements: the Non-Circumvention Agreement and the Distribution Agreement. *Id.* Under these two agreements, FSMS would source medical supplies from its established industry contacts, Tanner would connect FSMS with healthcare distributors, and the parties would share the profits equally. *Id.* The relationship ended almost before it began. *Id.* Though the parties agreed that neither would co-opt the "Personal Relationships" of the other without permission, and the two contracts imposed certain restrictions on Tanner's ability to enter direct contracts with manufacturers of medical supplies, FSMS alleges that Tanner breached both agreements by entering into a direct contract with its supplier Orient Gene, and proceeding to sell more than a billion dollars' worth of COVID tests to the government of the United Kingdom and other customers. *Id.* at 1-2.

In early 2021, FSMS filed suit against Tanner for breach of contract, alleging that Tanner deprived FSMS of more than $100 million in shared profits by entering into a direct contract with Orient Gene. Order at 1 (Oct. 16, 2023), ECF 39 (No. 23-cv-598). After the parties' relationship deteriorated—and around the time FSMS

filed its contract action—TPUK disbursed nearly $100 million in dividends to the Bournes, leaving TPUK with little cash. *Id.*

TPUK disbursed its dividends in relative secrecy, missing the United Kingdom's September 30, 2022, deadline for filing required 2021 financial disclosures. *Id.* at 3. In fact, TPUK did not release any information until the UK Registrar of Companies announced on March 7, 2023, that continued failure to file the required information would result in TPUK's dissolution, with all its property ceding to the Crown. *Id.* When TPUK did file its report on March 31, 2023, FSMS learned, for the first time, of the dividend disbursals. *Id.* FSMS further learned—from TPUK's 2022 financial disclosures, filed timely on September 29, 2023—that TPUK later issued another $100 million in dividends to the Bournes on March 8, 2022. *Id.* The combined disbursals left TPUK with approximately $10.5 million in reported net assets, while TPUK faced, according to FSMS, at least £75 million (approximately $102 million) in contingent liabilities for its actions at issue in *Tanner I*. *Id.* TPUK represented, both in a memorandum before the Court and in oral argument, that it would "issue no further dividends while FSMS I is pending without leave of Court." *Id.* (quoting ECF 27 at 2 (No. 23-cv-598)).

## PROCEDURAL HISTORY

FSMS first sued Tanner in state court in California on March 24, 2021. ECF 29-1. Tanner removed the case to federal court, contending that FSMS was "a citizen

4

of California." ECF 29-2 ¶ 12. On July 12, 2021, Tanner obtained an order from the California court dismissing that case for lack of personal jurisdiction. ECF 29-10.

FSMS refiled its complaint in this Court on September 23, 2021. ECF 1 (No. 21-501). The parties conducted jurisdictional discovery between January 2022 and August 2022; and in August 2022 FSMS filed an amended complaint alleging, *inter alia*, Unfair and Deceptive Trade Practices (UDTPA) against Tanner and Mr. Bourne. ECF 40 (No. 21-cv-501). Defendants filed five motions to dismiss, including on grounds of personal jurisdiction, *forum non conveniens*, and the merits. On September 30, 2023, the Court denied the procedural motions and the motion directed to the contract claims, but dismissed the UDTPA claim under Rule 12(b)(6).

In the meantime, as noted above, FSMS learned of Defendants' asset-stripping activities and, on September 20, 2023, filed *Tanner II*. ECF 1 (No. 23-cv-598). Defendants answered and the case moved into discovery.

On March 14, 2024, the Court consolidated *Tanner I* and *II* for discovery purposes and entered a Pretrial Order and Case Management Plan. ECF 164, 165 (No. 21-cv-501). Over the next nine months, the parties exchanged more than 100,000 documents and took approximately two dozen depositions. The Court resolved a substantial number of discovery motions.

On November 26, 2024, the Court granted Tanner leave to plead a counter-claim sounding in fraud and extended the discovery cutoff by two weeks. ECF 232.

FSMS moved to dismiss the counterclaim, ECF 235, and also moved to amend its complaint, ECF 239.

On the final day of discovery, Tanner filed a motion to compel, ECF 266, and FSMS filed a motion for spoliation sanctions under Rule 37(e), ECF 261. Those motions remain pending, as do several other motions from the discovery period.

On February 10, 2025, FSMS amended its citizenship disclosure to correct a factual misstatement. FSMS disclosed that, at the time it commenced *Tanner I* and *Tanner II*, one of its members, Zhen Zhen Tong, was a Chinese citizen permanently domiciled in California. *Tanner II*, ECF 103. Later that day, Defendants filed motions to dismiss *Tanner I* and *II* for lack of subject-matter jurisdiction. ECF 294 (No. 21-cv-501); ECF 104 (No. 23-cv-598).

On February 11, 2025, FSMS informed the Court that Ms. Tong had transferred her interest in FSMS to her husband, FSMS member Jim Mao. FSMS filed the present action the same day. ECF 1. The Complaint tracks the proposed Second Amended and Supplemental Complaint in *Tanner I*. ECF 239-1 (No. 23-cv-501).

## ARGUMENT

### I. The Court Has Subject-Matter Jurisdiction

Section § 1359 reads:

A district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court.

The statute does not apply for two independent reasons: (1) this case does not

6

come within the specific requirement that a party be "made or joined to invoke the jurisdiction of [the] court," and (2) FSMS did not act "improperly or collusively" within the meaning of the statute.[1]

## A. FSMS Was Not "Made Or Joined To Invoke The Jurisdiction" Of The Court

Section 1359 bars jurisdiction where a "party … has been 'improperly or collusively' *named* solely to create federal jurisdiction," such as where "land was purportedly sold to [an] out-of-state farmer but no money or deed changed hands," or where a "joinder of nondiverse party was without right and made in bad faith." *Lincoln Property Co. v. Roche*, 546 U.S. 81, 91-92 (2005) (emphasis added; internal quotation marks omitted). FSMS was not "named solely to create federal jurisdiction," *id.,* because it is and has always been the real party in interest.

---

[1] There is a third reason as well: there was always diversity, as we explained in our opposition to the motions to dismiss *Tanner I* and *Tanner II*. Defendants' reply brief on that motion contends that the question is controlled by *General Technology Applications, Inc. v. Exro Ltda*, 388 F.3d 114, 120-21 (4th Cir. 2004). Defendants did not cite *General Technology* in their moving papers, and their reliance on it for the first time in their Reply is misplaced. *General Technology* did not involve a dual-citizen suing a diverse U.S. citizen, as this case does. The case arose out of a dispute between a Virginia corporation (GTA) and a Columbia corporation (Exro). The two formed an LLC called EXG. When litigation arose, Exro (the Columbian corporation) sued EXG and a group of Virginia individuals. Importantly, there was no dispute that Exro was an alien and only an alien. The question arose whether EXG (the LLC) should be realigned as a plaintiff or remain as a defendant for the diversity analysis, but that question did not alter the outcome under § 1332. If EXG was a defendant, as named, then the suit was between an alien (Exro) and a dual citizen (EXG), which meant that § 1332(a)(2) was unavailable (aliens on both sides) and § 1332(a)(3) was unavailable (no citizens on both sides). If EXG was realigned as a co-plaintiff, then there were citizens of Virginia on both sides, also meaning that § 1332(a)(1) and § 1332(a)(3) were unavailable. Thus, *General Technology* does not answer the question presented in *Tanner I* and *Tanner II*, which is whether § 1332(a)(3) is available when a dual citizen sues a ***diverse*** defendant plus an alien.

7

Dropping a non-diverse LLC member does not come within the specific terms of § 1359, as the Second Circuit has explained, because the plain meaning of the word "made" does not encompass the transfer of a membership interest in a pre-existing LLC. *Castillo Grand, LLC v. Sheraton Operating Corp.*, 719 F.3d 120, 125 (2d Cir. 2013).

This Court should follow the Second Circuit's decision in *Castillo Grand*, which Defendants admit arises from facts that are "materially identical" to those here. ECF 27 at 7-8. Defendants cite the unpublished district court decision in *Castillo Grand*, 2009 WL 4667104 (S.D.N.Y Dec. 9, 2009), but fail to mention that the Second Circuit reversed the district court.

*Castillo Grand* involved an LLC that had non-diverse members, whose citizenship was discovered deep into the proceedings. 719 F.3d at 122. The plaintiff dropped the non-diverse members and refiled an otherwise identical action in federal court. *Id.* The district court then dismissed the refiled case (as Defendants point out) under § 1359 and even sanctioned the plaintiff for attempting to salvage jurisdiction by removing the non-diverse members and refiling the suit. *Id.* The case proceeded in state court and the plaintiff appealed the sanction, which the Second Circuit reversed as an abuse of discretion. *Id.* at 126.[2]

In reversing the sanction as an abuse of discretion, the Second Circuit found the district court's reason for dismissing the case unpersuasive. It explained: "As

_____

[2] In *Castillo Grand*, the *defendant* proceeded immediately to state court on the day it filed its motion to dismiss. *See Sheraton Operating Corp. v. Castillo Grand, LLC,* 34 Misc. 3d 1207(A), 943 N.Y.S.2d 794 (Sup. Ct. Westchester County 2011). Here, in contrast, Defendants filed an answer in this Court.

used in [Section 1359], the word ['made'] seems to have two possible meanings: It could mean that a party was 'made' in the sense of being created. Or, with only the slightest rearrangement of the text, it could mean that a person was 'made to become a party.'" *Id.* at 125. As to the sense of "being created," the Second Circuit pointed to a Nineteenth Century Supreme Court case in which a corporation was formed for the purpose of becoming a party in a diversity action, which, the Court said, "'should be regarded as a case of an improper and collusive *making of parties* for the purpose of creating a case cognizable in the [federal] court.'" *Id.* (quoting *Lehigh Mining & Mf'g Co. v. Kelly*, 160 U.S. 327, 342 (1895)) (emphasis and alterations by the Second Circuit). As to the sense of "made to become a party," the Court pointed to cases like the Fourth Circuit's decision in *Lester v. McFaddon*, 415 F.2d 1101 (4th Cir. 1969), "rejecting jurisdiction where a diverse person is selected as an administrator [of an estate] and then made to become a party for the purpose of obtaining federal jurisdiction." *Id.* (citing *Lester*, 415 F.2d at 1102-06).

Here, it is beyond dispute that FSMS was created (*i.e.*, "made") in March 2020 to bring personal protective equipment manufactured in China to market during the early days of the pandemic. Mao Dep. Vol. 1 69:20-23 (Ex. A); Cagan Dep. Vol. 2 38:17-39:21 (Ex. B). It is also beyond dispute that FSMS was not named (*i.e.*, "made to become a party") for the purpose of obtaining federal jurisdiction. It brought suit in its own name to enforce its own rights arising out of its own contractual relationship with Tanner. Because of these undisputed facts, § 1359 simply does not apply.

As the Second Circuit explained in words applicable here: "Castillo did not join a party by assignment or otherwise, and it strains the word to say that it 'made'

a party (or caused itself to be made a party) by dropping its non-diverse members."[3]

Virtually all Defendants' cases are in accord with the Second Circuit's reasoning in *Castillo Grand*. In three of those cases, the plaintiffs were corporations that were "made" (*i.e.*, created) for the specific purpose of becoming a party in a diversity action. *See Branson Label, Inc. v. City of Branson, Mo.*, 793 F.3d 910, 913-14 (8th Cir. 2015) (plaintiff corporation formed "[a] few days" before filing suit in federal court, and after its principal had suffered "setbacks" in state-court litigation); *Toste Farm Corp. v. Hadbury, Inc.*, 70 F.3d 640, 642 (1st Cir. 1995) (following dismissal of a case for lack of diversity, non-diverse plaintiff "was merged into … a [diverse] corporate shell that had been created earlier in the year"); *Prudential Oil Corp. v. Phillips Petroleum Co.*, 546 F.2d 469, 470 (2d Cir. 1976) (plaintiff was "a newly-created, 100 percent owned diverse subsidiary, which owns no other assets and is engaged solely in the prosecution of the claim").

Defendants' other cases (save two) involved plaintiffs who were "made to become a party" for the purpose of invoking diversity jurisdiction. *See Kramer v.*

---

[3] The Second Circuit had another reason to reverse the sanction: the Supreme Court's reasoning in *Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567 (2004). It said that "when the Supreme Court decided a case with facts extremely close to those of the pending case, it never mentioned section 1359." *Castillo Grand*, 719 F.3d at 125. *Grupo Dataflux* held that the dropping of the non-diverse partners was not "a change in the parties to the action, but ... a change in the citizenship of a continuing party." *Grupo Dataflux*, 541 U.S. at 575. This made jurisdiction unavailable under 28 U.S.C. § 1332(a)(2). *Id.* The Supreme Court also offered a practical solution: "the obvious course for a litigant whose suit was dismissed [for lack of diversity jurisdiction based on the time-of-filing rule] would have been immediately to file a new action." *Id.* at 581. The Second Circuit held that it was reasonable for the plaintiff to have read "the Supreme Court's language" in *Grupo* as making "refiling permissible" after dropping non-diverse members. *Castillo Grand*, 719 F.3d at 126.

*Caribbean Mills, Inc.*, 394 U.S. 823, 824 (1969) (non-diverse real party in interest assigned its claim for a total of $1 and retained a 95% interest in the claim); *Williams v. Nottawa*, 104 U.S. 209, 211 (1881) ("the actual owners of the bonds…could not sue in the courts of the United States, and Williams distinctly testifies that he received and held their bonds solely for the purpose of collection with his own, and for their account"); *Lester*, 415 F.2d at 1103 (the diverse plaintiff was a "straw party" who "has done little more than lend the use of his name" and "superficially converted [the action] into a dispute between citizens of different states"); *Airlines Reporting Corp. v. S & N Travel, Inc.*, 58 F.3d 857, 861-63 (2d Cir. 1995) (the plaintiff was acting as a collection agent for non-diverse assignors, who were the "real and substantial parties" and assigned their claims after a motion to dismiss was filed); *Shamis v. Ambassador Factors Corp.*, 1997 WL 473577, at *1, *5 (S.D.N.Y. Aug. 18, 1997) (the real party in interest—a non-diverse corporation—assigned its claims to its "shareholder, officer and director" shortly before filing its complaint). The two outliers were district court cases that followed the *district court* reasoning in *Castillo Grand* without considering the *Second Circuit* reasoning in that very same case, reversing the district court.[4]

---

[4] The two outliers are *Gulf Fleet Tiger Acquisition, L.L.C. v. Thoma-Sea Ship Builders, L.L.C.*, 282 F.R.D. 146, 157 (E.D. La. 2012), which followed the District Court decision in *Castillo Grand*, but was decided before the Second Circuit's 2013 decision, and *Bugsby Prop. LLC v. Alexandria Real Est. Equities, Inc.*, 2020 WL 1974147, at *4 (S.D.N.Y. Apr. 24, 2020), which is directly contrary to (and fails to cite) the Second Circuit's controlling decision in *Castillo Grand*.

11

Simply put—and fully consistent with the Second Circuit's analysis in *Castillo Grand*—the plaintiffs in *Branson Label*, *Toste Farm*, and *Prudential Oil* were *made* (i.e., created) for the purpose of invoking federal jurisdiction, and the plaintiffs in *Kramer*, *Williams*, *Lester*, *Airlines Reporting* and *Shamis* were "made to become parties" (*i.e.*, were appointed or took assignments) for the same purpose.

This case is different from those. As the Second Circuit explained in *Castillo Grand*, an LLC's "action in dropping its non-diverse members…does not appear to fit within the literal wording of the actions proscribed by section 1359." *Castillo Grand,* 719 F.3d at 125-26.

## B.   FSMS Did Not Act Improperly or Collusively

Even if the removal of a non-diverse LLC member were subject to analysis under § 1359—and it is not—the fact that FSMS dropped a non-diverse member would not support a finding of collusion—regardless of the motive for doing so—because FSMS (and only FSMS) has a stake in the outcome. Where it applies, § 1359 forbids sham transactions to create diversity and does not forbid *bona fide* transactions, even where such transactions were undertaken for the purpose of invoking the diversity jurisdiction of the federal courts. The "common thread" for dismissal is a "lack of a stake in the outcome *coupled with* the motive to bring into a federal court a local action normally triable only in a state court." *In re Bestwall LLC*, 71 F.4th 168, 180 (4th Cir. 2023) (quoting *Lester*, 415 F.2d at 1106 n.11) (emphasis added).

The facts here do not involve a "lack of a stake in the outcome," *id.*, which the Supreme Court and the Fourth Circuit have repeatedly taught is required to trigger the statute. *See Lester*, 415 F.2d at 1103 (dismissing because of the creation of a

"straw party" who "has done little more than lend the use of his name"). There is no dispute that FSMS is the real party in interest: It was FSMS that entered into the Non-Circumvention Agreement and Distribution Agreement with Tanner and FSMS that filed suit following Tanner's breaches. FSMS is not a "straw party" that took a sham assignment.

### 1. Sham Plaintiffs Are Forbidden, But FSMS Is Not A Sham Plaintiff

Section 1359 was "designed to prevent the litigation of claims in federal court by suitors who by sham, pretense, or other fiction acquire a spurious status that would allow them to invoke the limited jurisdiction of the federal courts." *Nolan v. Boeing Co.*, 919 F.2d 1058, 1067 (5th Cir. 1990). Thus, soon after Congress enacted the predecessor to § 1359, the Supreme Court began dismissing diversity cases involving sham plaintiffs.[5] In *Kramer v. Caribbean Mills, Inc.*, 394 U.S. 823 (1969), the Court applied § 1359 to an assignment for which the named plaintiff paid $1 while promising to pay 95% of his net recovery on the assigned cause of action. *Id.* at 824. "When the assignment to Kramer is considered together with his total lack

---

[5] *See, e.g., Williams*, 104 U.S. at 211 (denying jurisdiction where the plaintiff held bonds "solely for the purpose of collection" and "for [the] account" of non-diverse owners); *Hayden v. Manning*, 106 U.S. 586, 587-88 (1883) (denying jurisdiction where the plaintiff was the son-in-law of the real party in interest and was named "without his knowledge" and "in order to make a simulated case of jurisdiction in the federal court"); *Farmington Village Corp. v. Pillsbury*, 114 U.S. 138, 145-146 (1885) (denying jurisdiction where Maine citizens who owned bonds issued by a Maine village transferred coupons from the bonds to a citizen of Massachusetts in exchange for a 50% interest in whatever he could recover: "the transfer of the coupons was 'a mere contrivance, a pretense, the result of a collusive arrangement to create'" federal jurisdiction); *Little v. Giles*, 118 U.S. 596, 597-98 (1886) (denying jurisdiction where the real parties in interest executed a "pretended deed" to one of their fathers-in-law for the purpose of carrying out a "fraudulent scheme" and manufacturing diversity jurisdiction).

of previous connection with the matter and his simultaneous reassignment of a 95% interest back to Panama, there can be little doubt that the assignment was for purposes of collection." *Id.* at 827.

The Fourth Circuit has followed this line of cases. It recently explained: "We have found this statute violated when a nominal party has no real stake in the outcome of a case such that the only possible reason for its involvement is to create jurisdiction." *In re Bestwall LLC*, 71 F.4th at 180; *see Vaughan v. Southern Ry. Co.*, 542 F.2d 641, 644 (4th Cir. 1976) ("With no stake in the outcome of the controversy, substantive diversity of citizenship is … artificial and shadowy."); *Bishop v. Hendricks*, 495 F.2d 289, 295 (4th Cir. 1974) (no diversity jurisdiction because administrator was "[w]ithout any 'real (or) substantial interest in the outcome of the litigation,' [and] possesses 'no stake in the litigation'"); *Lester*, 415 F.2d at 1106 ("If a nominal plaintiff … has no stake in the outcome, if he is a real party in interest only in the narrow procedural sense of those words and his appointment was secured solely for the purpose of creating diversity of citizenship, the apparent diversity is pretensive."); *Turnbull v. Ross*, 141 F. 649, 651 (4th Cir. 1905) (diverse plaintiff was non-diverse real-party-in-interest's brother-in-law and did not appear to have been present at the trial); *Tee Feral Golf, LLC v. MJM Golf, LLC*, 2022 WL 17546943, at *1 (4th Cir. Dec. 9, 2022) (quoting *Lester*); *compare Miller v. Perry*, 456 F.2d 63, 67 (4th Cir. 1972) (upholding jurisdiction notwithstanding § 1359, because the decedent and his beneficiaries were diverse, so the appointment of a non-diverse personal representative did not defeat diversity: "In every real sense, this is a diversity case.").

14

There is no suggestion of any kind, after a year of very intensive discovery, that FSMS is anything but the sole, *bona fide*, real party in interest.

## 2. *Bona Fide* Plaintiffs Like FSMS Are Permitted, Even If Motivated To Enable Diversity Jurisdiction.

In contrast to the sham-plaintiff cases, the Supreme Court has repeatedly held that *bona fide* plaintiffs do not require dismissal under § 1359, even in cases involving transactions undertaken for the purpose of enabling diversity jurisdiction.

In *Cross v. Allen*, 141 U.S. 528, 531-32 (1891), an investment firm transferred notes and mortgages to one of its partners, Allen, for purposes of enforcing them. At trial, Allen "admitted that one of the purposes of that transfer was to make a case for the jurisdiction of the federal courts." *Id.* The Court rejected the challenge to jurisdiction: "The transfer of the notes and mortgages having been made for a valuable consideration, and, the pecuniary interest of the transferrer in the subject-matter of the transfer having thereby terminated, it makes no difference that by such transaction the transferee acquired the advantage of suing in the federal court." *Id.* at 533.

In *South Dakota v. North Carolina*, 192 U.S. 286 (1904), the owners of bonds gave them to the State of South Dakota with the intention that the state bring a suit in federal court, having "been advised that they cannot maintain a suit against the State of North Carolina on these bonds, but that such a suit can be maintained by a foreign state or by one of the United States." *Id.* at 270. The Supreme Court held that South Dakota had good title, because the bonds were "not held by the state as representative of individual owners … for they were given outright and absolutely to the state." *Id.* The donor's *motive* to invoke federal jurisdiction was not relevant:

[P]robably the donor made the gift under a not unreasonable expectation that South Dakota would bring an action against North Carolina to enforce these bonds, and that such action might enure to his benefit as the owner of other like bonds. But the motive with which a gift is made, whether good or bad, does not affect its validity or the question of jurisdiction.

*Id.* at 310. The Court explained that the conveyance appeared "to be a real transaction" and declined to "inquire into the motives which actuated the parties in making the conveyance." *Id.* at 311 (cleaned up).

And in *Williamson v. Osenton*, 232 U.S. 619, 623 (1914), the plaintiff changed her state of citizenship "for an indefinite time in order that she might institute this suit against the defendant in the United States court." The Court held that "the motive for the change was immaterial; for … the plaintiff had a right to select her domicile for any reason that seemed good to her." *Id.* at 625.

These cases are still good law. As one leading treatise explains, "just as individuals can create diversity of citizenship by moving to another state, a corporation may dissolve itself and reincorporate in another state (or conceivably move its principal place of business to another state) in an attempt to create federal subject matter jurisdiction that otherwise would not exist." 13F *Wright & Miller's Fed. Prac. & Proc. Juris.* § 3638 (3d ed.). "The section now in force ameliorates the problems of the earlier statute by permitting the creation of diversity jurisdiction by an assignment that is bona fide." *Id.* at § 3639. Another leading treatise agrees: "if the transfer of a claim is absolute, with the transferor retaining no interest in the subject matter, the transfer is deemed not to be improper or collusive, regardless of the transferor's motive." 15A *Moore's Fed. Prac.—Civ.* § 102.19 (2025).

16

The history of § 1359 supports this conclusion. Congress originally enacted the statute in 1875 "for the purpose of denying the use of federal courts in suits which did not 'really and substantially involve a dispute or controversy properly within the jurisdiction' of the federal courts. This statute stated in express terms." *Bishop*, 495 F.2d at 293-94 (quoting Act of March 3, 1875, § 5, 18 Stat. 470). In 1948, as part of the revisions to the Judicial Code, Congress repealed an anti-assignment statute and amended the anti-collusion statute for the purpose of "removing a few limitations on jurisdiction and its exercise," not for the purposes of *expanding* the reach of § 1359. James W. Moore, *Moore's Judicial Code Commentary* ¶ 0.03(27) at 158 (1949). As Professor Moore, who was a Special Consultant on the Revision Staff, explained: "[T]he pairing down of the section to collusiveness may aid in checking a past tendency that makes a fetish of federal jurisdiction…." *Id.* at 160.

### 3. The Facts Do Not Support A Finding Of Collusion

Defendants' urge the Court to apply a "facts and circumstances" test to determine whether there has been collusion in this case. ECF 27 at 6. Even under that test, Plaintiff prevails.

As a threshold matter, Defendants ask for a "presumption of collusion," on the theory that this is a transaction between "related parties." *Id.* Doing so would be imprudent, and certainly inconsistent with Supreme Court cases such as *Cross v. Allen*, in which a firm transferred its claim to one of its members, but the motive did not matter because the member was nonetheless the real party in interest. 141 U.S. at 531-33. There is a Circuit split on the applicability of such a presumption, and the Fourth Circuit has not weighed in. *See E.I. DuPont D Nemours & Co. v. Agfa NV*,

17

2019 WL 279989, at *7-8 (E.D. Va. Jan. 22, 2019) (noting circuit split and finding no error where the Magistrate Judge considered the corporate relationship between assignor and assignee as part of the totality of the circumstances rather than applying a presumption). There are good reasons not to adopt such a presumption—most important, that the statute does not contain one. As Judge Posner explained, writing for the Seventh Circuit, "Congress could if it wanted adopt a rule forbidding conferral of diversity jurisdiction by assignment to an affiliated corporation but it has not done so and we are given no urgent reason to try to do so in its place even to the extent of creating a soft rule, that is, a presumption." *Herzog Contracting Corporation v. McGowan*, 976 F.2d 1062, 10667 (7th Cir. 1992); *accord Ambrosia Coal and Const. Co. v. Pages Morales*, 482 F.3d 1309, 1314 (11th Cir. 2007) (following *Herzog*).

When it appears that a plaintiff may not be the real party in interest, courts engage in a "totality of the circumstances" test to demine the answer. *See Long & Foster Real Estate, Inc. v. NRT Mid-Atlantic, Inc.*, 357 F. Supp. 2d 911, 922 (E.D. Va. 2005). This test grew out of the "two factors set forth [by the Supreme Court] in *Kramer*, that is, whether (1) there was nominal or no consideration involved in the transaction; and (2) the interest in the action retained by the assignor." *Pasquotank Action Council, Inc. v. City of Virginia Beach*, 909 F. Supp. 376, 383 (E.D. Va. 1995). Courts consider a variety of factors, including "(i) whether there was nominal or no consideration involved in the assignment; (ii) whether the assignee had had any previous connection to the assigned claim; (iii) whether there was a legitimate business reason for the assignment; (iv) whether the timing of the assignment suggests that it was merely an effort to secure federal diversity jurisdiction; (v) whether

the assignor exercises any control over the conduct of the litigation; and (vi) whether the assignor retains any interest in the action, *i.e.,* is the assignor to receive a percentage of the assignee's recovery." *Long & Foster*, 357 F. Supp. 2d at 922-23 (collecting cases). Here, the totality of the circumstances weigh in FSMS's favor:

**First:** Unlike *Kramer* and similar cases, Ms. Tong has no contingent interest in the claim. *See* Assignment of Membership Interest (Feb. 10, 2025) (assigning, transferring, and conveying all of her right, title, and interest in and to all of her FSMS voting units) (Ex. C). She has no right to receive any percentage of FSMS's recovery in this action and no right even to receive distributions from FSMS. *Id.* FSMS is the sole real party in interest. It (and no one else) is the party with standing to pursue the claim. This factor weighs in FSMS's favor.

**Second:** It is true that Ms. Tong received no consideration for her interests, but this factor is neutral. Transfers between spouses are permitted "with or without consideration." California Family Code § 850. As in *South Dakota v. North Carolina*, 192 U.S. at 270, what matters is that the gift was real, not that it was a gift.

**Third:** Mr. Mao indisputably had and has a central connection to FSMS. Along with Mr. Cagan, Mr. Mao has been an integral component of FSMS's operations and a key driver of the facts underpinning this case. Indeed, during the more than 10 hours of substantive testimony Mr. Mao gave concerning his involvement in the underlying facts, he described how he found Orient Gene, met (over zoom) with senior management, negotiated FSMS's contracts with Orient Gene, and facilitated the connection between Orient Gene and Tanner at Tanner's deceptive urging. *See, e.g.*, Mao Dep. 116:3-117:3; 107:10-21; 158:2-17; 187:10-188:22 (Ex. A). As

one of FSMS's contract salespeople put it, "Mr. Mao had a close, unique connection with these [Chinese] factories that other people did not. And therefore [FSMS] was able to receive product at a high volume and expedited rate, shipped out of China." Hooks Dep. 38:20-24 (Ex. D).

**Fourth:** The reason for the transfer was to enable FSMS to continue to pursue its claims against Tanner in the most effective and efficient manner possible, given the substantial judicial investment in this case by the Court and its staff in the Western District of North Carolina. This is a legitimate business reason and a factor favoring FSMS. *See In re Seneca Investments LLC*, 970 A.2d 259, 265-66 (Del. Ch. 2008) ("Pursuing claims … is acceptable and legitimate business activity."). The fact that FSMS no longer sells covid-related products is not a "jurisdictional defect," as Defendants contend, but rather it demonstrates FSMS's legitimate business reasons for proceeding in this manner. *See, e.g.*, *id.* at 260, 266 (LLC's pursuit of counterclaims was a legitimate business activity, notwithstanding the fact that it was "functioning only as a passive investment vehicle and has conducted limited active business over the past several years").

**Fifth:** The timing of the assignment was to preserve the substantial judicial investment in this case and ensure that judicial resources would not be wasted. Fed. R. Civ. P. 1. FSMS relied on the Supreme Court's guidance in *Grupo Dataflux* with respect to the steps a plaintiff might take to salvage jurisdiction when confronted with a diversity issue created by certain of the LLC's non-diverse members. *See Castillo Grand*, 719 F.3d at 124-25. Surely, reliance on Supreme Court guidance cannot be evidence of "collusion" or "impropriety."

**Sixth:** The assignor exercises no control whatsoever over the conduct of the litigation. Ms. Tong exercised no control over the conduct of the litigation before she transferred her membership interests, nor does she retain any right to exercise any such control over the litigation going forward. Before the transfer, Article 7.1 of the Operating Agreement dated March 31, 2020, named Mr. Cagan as President and CEO, Mr. Mao as Treasurer and Secretary; and Ms. Tong as a Director, specifying that "A Director shall work at the direction of the President, Treasurer or Secretary." (Ex. E). The same Article of the Amended and Restated Operating Agreement dated February 10, 2025 removed Ms. Tong as a member *and* as a Director. (Ex. F).

Under the totality of the circumstances, FSMS is not a party that "has been improperly or collusively made or joined to invoke the jurisdiction" of this court.

## II.    The Action Is Timely

### A.    There Is No Statute Of Limitations Bar

Plaintiff's claims are timely, because "filing an action in federal court which is based on state substantive law *does* toll the statute of limitations while that action is pending." *Clark*, 110 N.C. App. at 808 (emphasis added). Tolling the statute while a case is alive is consistent with the purpose of the statute of limitations, which is to put defendants on notice of claims that are being asserted against them. "The important consideration is that, by invoking judicial aid, a litigant gives timely notice to his adversary of a present purpose to maintain his rights before the courts." *Clark*, 110 N.C. App. at 807 (quoting numerous cases; emphasis omitted). Once the claims are filed, the purpose of the statute of limitation is satisfied, because "the defendant is on notice that he must defend himself." *Simpson v. Air Liquide Am., LP*, 2009 WL

2171274, at *3 (W.D.N.C. July 20, 2009).

Defendants' attempt to evade the holding of *Clark* is meritless.

**First:** Defendants contend that the Court of Appeals of North Carolina in *Clark* engaged in a "hypothetical" exercise. ECF 29 at 16. Nonsense. The *Clark* court described its decision as a *holding* ("we hold that"), and properly so: The Court of Appeals does not offer advisory opinions. *McCauley v. Thomas*, 242 N.C. App. 82, 94 (2015). The rule in North Carolina *already* was that "the statute of limitations is tolled when legal action is commenced," *Carl Rose & Sons Ready Mix Concrete, Inc. v. Thorp Sales Corp.*, 36 N.C. App. 778, 780 (1978), and that it "stays tolled as long as the action is alive." *Long v. Fink*, 80 N.C. App. 482, 485 (1986). The *Clark* court simply *expanded* that rule to include *federal court* filings: "we hold that filing an action in federal court which is based on state substantive law *does* toll the statute of limitations while that action is pending." 110 N.C. App. at 808 (emphasis added).

Contrary to Defendants' assertion that the holding in *Clark* is mere *dicta*, it was affirmed by the Supreme Court of North Carolina and has been cited with approval and followed repeatedly by the North Carolina Court of Appeals,[6] the North

---

[6] *E.g.*, *Devonwood-Loch Lomond Lake Ass'n v. City of Fayetteville*, 908 S.E.2d 66, 77 (N.C. Ct. App. 2024) ("filing an action in federal court which is based on state substantive law tolls the statute of limitations while that action is pending") (cleaned up); *Huang v. Ziko*, 132 N.C. App. 358, 360-61 (1999) ("filing an action in federal court which is based on state substantive law tolls the statute of limitations while that action is pending") (cleaned up); *Ward v. Lyall*, 125 N.C. App. 732, 733-34 (1997) (quoting *Clark* and holding that "[t]he statute of limitations was then tolled on the defamation claim until the Fourth Circuit affirmed the district court's dismissal of the federal action"); *see also Housecalls Home Health Care, Inc. v. State, Dep't of Health & Hum. Servs.*, 200 N.C. App. 66, 74 (2009) (Geer, J., concurring) ("This Court has held that 'filing an action in federal court which is based on state substantive law does toll the statute of limitations while that action is pending.'")

Carolina Business Court,[7] and the federal courts in North Carolina.[8] The Fourth Circuit applied the same rule in *Aikens v. Ingram*, 524 F. App'x 873, 874, 879 (4th Cir. 2013). There, the plaintiff's first action was dismissed because he failed to exhaust administrative remedies. Nonetheless, the court held, "under North Carolina law, the statute of limitations was tolled between April 27, 2006, [when the first action was filed,] and September 13, 2007, when the district court issued its First Dismissal Order." *Id.* The Fourth Circuit held the second action timely. *Id.* at 879, 884.

*Clark* and its progeny firmly establish that FSMS's claims are timely because they were filed while *Tanner I* and *II* were alive. Defendants' failure to cite these cases (except for two in a dismissive footnote, ECF 29 at 17) is sloppy at best.

**Second:** Defendants contend that *Clark*'s reliance on an Indiana case means that *Clark* has "no bearing here" because the Indiana case was construing an Indiana

---

(quoting *Clark*).

[7] *TaiDoc Tech. Corp. v. OK Biotech Co.*, 2016 NCBC 26 ¶ 62, 2016 WL 1221425, at *15 (N.C. Super. Mar. 28, 2016) ("North Carolina courts hold that filing an action in federal court 'toll[s] the statute of limitations on a claim which is based on state substantive law.'") (quoting *Clark*).

[8] *Dutcher v. Eastburn*, 2011 WL 1134666, at *7 n.5 (E.D.N.C. Mar. 26, 2011) (under North Carolina law, the statute of limitations "is tolled while an action in federal court based on state substantive law is pending") (citing *Clark*); *McCullough v. Branch Banking & Tr. Co.*, 844 F. Supp. 258, 261 (E.D.N.C. 1993) ("under North Carolina law, 'filing an action in federal court which is based on state substantive law ... toll[s] the statute of limitations while that action is pending.' As a result, if the plaintiff's state claims were timely filed in federal court, the plaintiff will be able to refile the claims in state court.") (quoting *Clark*), *aff'd*, 35 F.3d 127 (4th Cir. 1994); *Lawrence v. Cooper*, 2009 WL 10703082, at *2 (E.D.N.C. Nov. 24, 2009) (describing the rule as allowing refiling in statue court because "the court in *Clark* held that 'filing an action in federal court which is based on state substantive law does toll the statute of limitations while the action is pending'") (quoting *Clark*, 110 N.C. App. at 808), *aff'd*, 398 F. App'x 884 (4th Cir. 2010).

statute that has no analog in North Carolina. Nonsense again. As discussed above, the question in *Clark* was whether to extend the pre-existing North Carolina rule that filing a complaint tolls the statute of limitations to cases filed in *federal* court but dismissed for lack of subject-matter jurisdiction. The Indiana case, *Torres v. Parkview Foods*, 468 N.E.2d 580, 582-83 (Ind. Ct. App. 1984), addressed that issue directly. The *Clark* court found its reasoning persuasive, explaining that "[t]he *Torres* court held that filing a case in federal court under the mistaken belief that the federal court had jurisdiction was not the type of fault which prevents the tolling of the statute of limitations," the "*Torres* court looked to the purpose of the statute of limitations in making its decision," and "[w]e agree with the reasoning in the *Torres* case." *Clark*, 110 N.C. App. at 807.

Separately, the court considered the question whether Rule 41(b) allowed an additional year for plaintiff to refile after the dismissal became final, explaining that there were "two issues." *Clark*, 110 N.C. App. at 806. The Court's decision with regard to pending-action tolling did not turn on anything in Rule 41(b), contrary to Defendants' contention.

**Third:** Defendants' argument that *Tanner I* and *Tanner II* were not "properly instituted" cannot be reconciled with *Clark*. There, the plaintiff sued in federal court, the federal court dismissed the case for lack of subject-matter jurisdiction, and the Fourth Circuit affirmed, explaining: "plaintiffs cannot by artful pleading transform their state negligence action into a substantial federal question." *Clark v. Velsicol Chem. Corp.*, 944 F.2d 196, 199 (4th Cir. 1991). But the erroneous invocation of federal jurisdiction did not render the filing improper:

The statute is designed to insure to the diligent suitor the right to a hearing in court till he reaches a judgment on the merits. Its broad and liberal purpose is not to be frittered away by any narrow construction. *The important consideration is that, by invoking judicial aid, a litigant gives timely notice to his adversary of a present purpose to maintain his rights before the courts.* When that has been done, a mistaken belief that the court has jurisdiction stands on the same plane as any other mistake of law.

*Clark*, 110 N.C. App. at 807 (quoting *Torres,* 468 N.E.2d at 583, quoting, in turn, *Roth v. Northern Assurance Co.*, 32 Ill. 2d 40, 46, 203 N.E.2d 415, 418 (1964), quoting, in turn, *Gaines v. City of New York,* 215 N.Y. 533, 539, 109 N.E. 594, 596 (1915)) (emphasis by the court). Similarly, the plaintiff in *Aikens* had his first action dismissed for lack of jurisdiction, and the Fourth Circuit found that the statute of limitations was tolled while the first action was pending. 524 F. App'x at 874, 879.

The cases Defendants cite (ECF 29 at 17-18) are not to the contrary. In *Lee v. City of Fayetteville*, 2017 WL 2274970 (E.D.N.C. May 24, 2017), the court held that the prior-action rule was *available* against a previously named defendant, but that the "plaintiff's suit was not properly instituted against the John Doe defendants because they were never named." *Id.* at *5. Defendants' other cases concern equitable tolling,[9] which is not at issue here, or simply recite *generalized* statements about subject-matter jurisdiction and do not discuss whether cases dismissed for lack of jurisdiction toll the statute of limitations.[10]

**Fourth:** Defendants contend that there has been "fault or neglect" in this case,

---

[9] *Shofer v. Hack Co.*, 970 F.2d 1316, 1319 (4th Cir. 1992).

[10] *S.C. Dep't of Disabilities & Special Needs v. Hoover Universal, Inc.*, 535 F.3d 300, 302-03 (4th Cir. 2008); *Price v. Deal*, 2014 WL 3547367 *6 (W.D.N.C. July 17, 2014).

on the theory that the factual error concerning Ms. Tong's citizenship makes federal court a "clearly inappropriate forum." ECF 29 at 18 (quoting *Shofer*, 970 F.2d at 1319). That is doubly incorrect. First, *Clark* held that "filing a case in federal court under the mistaken belief that the federal court had jurisdiction was not the type of fault which prevents the tolling of the statute of limitations." 110 N.C. App. at 807. Second, that the courts are divided over the underlying diversity question at issue here, *see* ECF 297 (No. 21-cv-501), means that it cannot fairly be said that the court "clearly lacks jurisdiction," as was the case in *Shofer*.

**Fifth:** Defendants assert that because the Court granted a motion to dismiss the UDTPA claim, the statute of limitations for the claim started to run upon the Court's dismissal order. Defendants are wrong. A claim is "alive" until appeals of right have been exhausted. *Huang*, 132 N.C. App. at 360-61 ("plaintiff's federal action was no longer pending for the purpose of tolling the statute of limitations when the United States Court of Appeals reached its decision"); *Ward*, 125 N.C. App. at 734 ("The statute of limitations was then tolled on the defamation claim until the Fourth Circuit affirmed the district court's dismissal of the federal action…."). The Court's order dismissing the UDTPA claim "may be revised at any time before the entry of a judgment," Fed. R. Civ. P. 54(b), and upon entry of a final judgment, FSMS would still have an appeal as of right to the Fourth Circuit. 28 U.S.C. § 1291. Defendants' cases, in contrast, concern claims that were never brought in the first place.[11]

---

[11] *TaiDoc Tech.*, 2016 NCBC 26, ¶ 63, 2016 WL 1221425, at *16 ("because the state law claims pleaded in this action were not the claims pleaded in the Federal Action,

**Finally:** Defendants assert that the doctrine of equitable tolling is inapplicable. ECF 29 at 19-20; ECF 31 at 15. The doctrine of equitable tolling excuses a party's delay in bringing a claim when "delay has been induced by [a defendant's] acts, representations, or conduct." *Town of Pineville v. Atkinson/Dyer/Watson Architects, P.A.*, 114 N.C. App. 497, 500 (1994). FSMS is not traveling under an equitable tolling theory. To the contrary, the tolling doctrine detailed in *Clark* and its progeny is a distinct doctrine separate and distinct from equitable tolling. *Aikens*, 524 F. App'x at 882; *Blackmon v. Holder*, 2024 WL 4156826, at *4 (E.D.N.C. Sept. 11, 2024). Indeed, the Fourth Circuit in *Aikens* first tolled the statute of limitations while a prior case was pending and *then* evaluated whether equitable tolling would extend the statute of limitations to make up the remaining gap in time. *Aikens*, 524 F. App'x at 879.

### B. There Is No Statute Of Repose Bar

Defendants contend that the four-year limitation period in North Carolina's Uniform Voidable Transfer Act, N.C. Gen. Stat. § 39-23.9, is a "statute of repose" barring the transfers that Mr. Bourne caused TPUK to make in January 2021. ECF 29 at 19-20; ECF 31 at 16-17. They tacitly admit that the four-year statute did not

---

the Court concludes that the statute of limitations on TaiDoc's state law claims asserted in this lawsuit were not tolled as of the filing of the Federal Action."); *Renegar v. R.J. Reynolds Tobacco Co.*, 145 N.C. App. 78, 85 (2001) ("[T]he claim of wrongful discharge alleged in the state action and the federal statutory and constitutional claims alleged in the federal action each constitute independent causes of action with unique elements which must be proven by plaintiff, and RJR thus was not placed on notice by plaintiff's federal action that it would be asked to defend plaintiff's state wrongful discharge claim within the time required by the statute of limitations.") (cleaned up).

run for any other transfers, so this defense goes to the quantum of damages not the viability of the claim.

To begin, relief on the quantum of damages is not appropriate at the motion to dismiss stage: "damages issues are not properly resolved at the motion to dismiss stage," *Varghese v. China Shenghuo Pharmaceutical Holdings, Inc.*, 672 F. Supp. 2d 596, 611 (S.D.N.Y. 2009), and a motion to dismiss should not be used to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses," *See Bowser v. DeJoy*, 2024 WL 1809509, at *1 (W.D.N.C. Apr. 24, 2024) (citing *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) and *Eastern Shore Mkts. v. J.D. Assoc. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000)). Unsurprisingly, none of Defendants' cases support parsing damages at the motion to dismiss stage, especially where the claim must go forward.[12] The Court should reject Defendants' invitation to rule on the granular issue of the appropriate amount of FSMS's damages based on pleadings alone.

Moreover, the motion is meritless, even as to the portion of the damages to which it is directed. The reasoning of *Clark* applies equally to § 39-23.9 as it does to any statute of limitations, which are strictly enforced by North Carolina courts. "Statutes of limitations are inflexible and unyielding. They operate inexorably without reference to the merits of plaintiff's cause of action. They are statutes of repose, intended to require that litigation be initiated within the prescribed time or not at

---

[12] *See, e.g.*, *KB Aircraft Acquisition, LLC v. Berry*, 249 N.C. App. 74, 78 (2016) (dismissing the claim in its entirety); *Window World of Baton Rouge, LLC v. Window World, Inc.*, 2024 NCBC 79, 2024 WL 5053172, at *48-49 (N.C. Super. Ct. Nov. 26, 2024).

all." *Shearin v. Lloyd*, 246 N.C. 363, 370, 98 S.E.2d 508, 514 (1957); *accord Pearce v. N. Carolina State Highway Patrol Voluntary Pledge Comm.*, 310 N.C. 445, 451 (1984) (quoting *Shearin*); *Warren v. Snowshoe LTC Grp., LLC*, 293 N.C. App. 174, 179 (2024) (quoting *Shearin*). All such statutes are premised on the policy that, "by invoking judicial aid, [the] litigant gives timely notice to his adversary of a present purpose to maintain his rights before the courts." *See Clark*, 110 N.C. App. at 807.

Yet, the rule in North Carolina is that a statute of limitations does not run while an action between the parties on the claim is "alive." The reason for this rule is that the purpose of the statute—strict and unyielding as it may be—is fully met when the plaintiff brings a case against the defendant, even if in the wrong court. *See supra* pp. 21-25. The very same rule should be applied to this case, regardless of whether the statute is classified as a statute of "limitations" or one of "repose." Mr. Bourne cannot be said in any meaningful sense to have been enjoying "repose" from a challenge to the fraudulent conveyances. To the contrary, he has been actively engaged in litigation about those very transactions since September 2023.

This is not a matter of "equitable tolling," which is distinct from the prior-filed action rule applied in *Clark*. While equitable tolling is said to defeat the legislative purpose of a statute of repose by upsetting settled expectations of the defendant, no such argument can be made of the rule of *Clark*. In the words of § 39-23.9, FSMS "brought" the voidable transfer claims against Defendants well within the four-year period by filing *Tanner II*. Defendants are essentially asking the Court to ignore that the parties have been actively litigating this very claim for the last year

and a half, pretend that *Tanner II* was never filed, and indulge a fiction that Defendants were first made aware of FSMS's claims when *Tanner III* was filed.

The Bournes rely on *California Pub. Employees' Retirement Sys. v. ANZ Sec., Inc.*, 582 U.S. 497 (2017) ("*CalPERS*") for their argument that "filing one action within the statute of repose does not make 'any subsequent action raising the same claims timely.'" ECF 31 at 17. But *CalPERS* hurts the Defendants. That case held that a form of equitable tolling announced in *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974), was unavailable because it "derived from equity principles." 582 U.S. at 508. As discussed above, *Clark* and its progeny are *not* equitable tolling cases. *See supra* p. 27. They apply a form of tolling grounded in the statute itself: allowing the case to go forward fulfils "the purpose of the statute of limitations" because filing a case in federal court "puts a defendant on notice that a claim is being asserted against him." *Clark*, 110 N.C. App. at 807-08. The Supreme Court in *CalPERS* acknowledged that the outcome would have been different if *American Pipe* "had itself been grounded in a legislative enactment." 582 U.S. at 508. FSMS does not, and does not need to, rely on equitable tolling.

Moreover, *CalPERS* and *American Pipe* involved the unique circumstance of class-action litigation, and in both cases the Supreme Court held that an absent member of a putative class has not "brought" an action for purposes of *either* a statute of limitations *or* a statute of repose. *CalPERS*, 582 U.S. at 514-15. The opposite is true of FSMS, which "brought" its fraudulent-conveyance action against the Defendants in September 2023. In *Clark*, the court observed that "plaintiffs *brought* a personal injury action in the United States District Court" on a timely basis. *Clark*, 110 N.C.

App. at 807. So too, here. FSMS "brought" its voidable transaction claims in *Tanner II* within the time required by N.C. Gen. Stat. § 39-23.9.

## III.  FSMS States A UDTPA Claim

It is telling that Mr. Bourne has answered the complaint and is not moving to dismiss the UDTPA claim against him, except in part on statute of limitations grounds (discussed above). ECF 31 at 10-11. For its part, Tanner devotes only a few pages of its motion to dismiss to the UDTPA claim, arguing that "FSMS's UDTPA claim is a retread of the same claim that was dismissed in [*Tanner I*]." ECF 29 at 20. That is incorrect. The Complaint alleges specific facts that this Court has not had an opportunity to consider. Two categories of new evidence support taking a fresh look: intentional asset stripping; and fraudulent inducement.

### A.  Defendants Fraudulently Stripped TPUK Of Its Assets

FSMS states a claim under the UDTPA because Defendants stripped TPUK of $190 million that should have been maintained to pay FSMS's claims. Compl. ¶ 183. The Amended Complaint filed in August 2022 in *Tanner I* did not allege these facts because they were not disclosed until March 2023. *See* Order at 3 (Oct. 16, 2023) ECF 39 (No. 23-cv-598). The Complaint in this case contains detailed allegations that Mr. Bourne acted with an intent to hinder, delay, and defraud creditors—particularly FSMS—based on badges of fraud set out in the applicable statute. Compl. ¶ 198. Mr. Bourne does not challenge the factual sufficiency of FSMS's UDTPA claim, and argues only that the claim is time-barred, which it is not, and that the claim cannot survive when the voidable transfer claims are dismissed, which none but one would be even if Mr. Bourne's meritless statute of repose argument

were accepted. *See* ECF 31 at 12-14.

Courts have found that plaintiffs stated a UDTPA claim based on allegations of asset stripping. In *Swan Racing Co., LLC v. XXXtreme Motorsport, LLC*, 2015 WL 4430257, at *3 (W.D.N.C. July 20, 2015), the plaintiff alleged that the defendant took the plaintiff's asset without making the required payments and "stripped it of any of its value" and frustrated the payment method under the contract. *Id.*

Similarly, in *Ehmann v. Medflow*, 2022 NCBC 55, 2022 WL 4462356 (N.C. Super. Ct. Sept. 12, 2022), the plaintiff sued his employer and the majority share-holder, alleging that instead of making payments required under his employment contract, defendants transferred assets out of the entity that employed plaintiff, causing the entity to be unable to make the required payments. 2022 NCBC 55 ¶¶ 100, 111, 2022 WL 4462356, at *2–5. The court found that plaintiff stated a UDTPA claim based on the alleged "scheme of fraudulent transfer between multiple companies." *Id.* at *14; *accord Fleming v. Horner*, 2022 NCBC 26 ¶ 93, 2022 WL 1655493, at *11 (Bus. Court Mecklenburg Cty. May 24, 2022) ("The fraudulent transfers by Fleming seeking to avoid WFT's creditor negatively affects commerce and constitutes violations of this State's Unfair and Deceptive Trade Practices Act."); *KRG New Hill Place, LLC v. Springs Invs., LLC*, 2015 NCBC 69 ¶ 33, 2015 WL 4113368, at *6 (Bus. Court Wake Cty. July 8, 2015) ("The fraudulent transfer claim could support a claim for violation of the UDTPA.").

Some jurists have expressed concern that an award of treble damages arising in the context of a contractual relationship could "destroy the parties' bargain and force the defendant to bear a risk it never took on." *ACS Partners, LLC v. Americon*

*Group, Inc.*, 2010 WL 883663, at \*9 (W.D.N.C. Mar. 5, 2010). The asset-stripping takes this case out of that category: FSMS did not contractually accept the risk that Mr. Bourne would secretly strip assets from TPUK with an intention to deprive FSMS of the ability to collect its 50% share of the gross profits. As such, the Complaint alleges deceptive and unfair conduct in violation of an independent duty that is identifiable and distinct from a breach of contract claim.

Mr. Bourne concedes that asset stripping "can give rise to an unfair trade practices claim," ECF 31 at 13, and TPUK relegates its defense against the asset-stripping to a half-hearted footnote. ECF 29 at 24 n.24. The Court should therefore allow FSMS's UDTPA claim based on the stripping to proceed.

### B. Defendants Delivered The Distribution Agreement To FSMS With No Intent To Perform

A second set of new facts also supports the UDTPA claim notwithstanding the dismissal in *Tanner I*: merits discovery revealed facts from which a jury could infer that Tanner and Mr. Bourne entered into the Distribution Agreement with no intent to perform.

A breach of contract is unfair or deceptive under the UDTPA "if the promisor had no intent to perform when he made the promise." *Gilbane Bldg. Co. v. Fed. Rsrv. Bank of Richmond, Charlotte Branch*, 80 F.3d 895, 903 (4th Cir. 1996); *see Interstate Narrow Fabrics, Inc. v. Century USA, Inc.*, 218 F.R.D. 455, 465 (M.D.N.C. 2003) ("[A] breach of contract can constitute an unfair or deceptive trade practice if the promisor enters into the contract with no intent to perform under the contract."); *Hongda Chem USA, LLC v. Shangyu Sunfit Chem. Co., Ltd.*, 2016 WL 4703725, at

*4 (M.D.N.C. Sept. 8, 2016) (a UDTPA claim may proceed where allegations support the inference that "promisor had a specific intention not to perform at the time the promise was made") (cleaned up); *Swan Racing Co., LLC*, 2015 WL 4430257, at *3 (allowing UDTPA claim where plaintiff alleged that defendant "did not intend to perform the Agreement and abandoned and even frustrated the performance of the [] Agreement within days of agreeing to its terms"); *Wilson v. McAleer*, 368 F. Supp. 2d 472, 476 (M.D.N.C. 2005) (holding that allegations showing that a defendant never intended to perform a contract were sufficient to sustain a fraud and UDTPA claim over a motion to dismiss).

Mr. Bourne acknowledges the allegations of an intent not to perform, ECF 31 at 5-6, but does not mention these facts in his argument, *id.* at 10. For its part, Tanner relies exclusively on this Court's statement that its "partial performance demonstrates Defendants' intent to *fulfill* the agreement when formed." ECF 29 at 21 (quoting Order at 13 (Sept. 30, 2023) (emphasis added), ECF 117 (No. 21-cv-501)). However, new evidence produced during discovery supports the inference that Tanner and Mr. Bourne did *not* intend to perform the contract when they entered into it.

Before discussing that evidence, we reiterate certain basic principles. Even if partial payments in November 2020 and February 2021 *were* evidence of an intent to perform back in September 2020, that evidence would conflict with other evidence described below—and the Court's role at this stage is to draw reasonable inferences in favor of the *plaintiff*, not to "weigh the facts or assess the evidence." *Peter Marco, LLC v. Banc of Am. Merch. Servs., LLC*, 660 F. Supp. 3d 453, 461 (W.D.N.C. 2023); *Arku v. Wells Fargo Bank, N.A.*, 621 F. Supp. 3d 602, 605

(W.D.N.C. 2022). Moreover, state of mind is a question for the jury unless the record is devoid of any facts supporting an inference that the defendant had the requisite intent. *Magill v. Gulf & Western Indus.*, 736 F.2d 976, 979 (4th Cir. 1984). Finally, "[u]nder N.C.G.S. § 75–1.1, a jury decides whether defendants committed the alleged acts, and then court will decide, as a matter of law, 'whether these proven facts constitute an unfair or deceptive trade practice.'" *Movement Mortg. LLC v. Summit Funding, Inc.*, 2024 WL 57341, at *3 (W.D.N.C. Jan. 4, 2024) (quoting *United Labs., Inc. v. Kuykendall*, 335 N.C. 183, 187 n.2 (1993)).

### 1. Pre-Contractual Conduct.

Tanner met FSMS in June 2020, and immediately expressed interest in obtaining rapid test kits manufactured by Orient Gene. Compl. ¶ 26. FSMS had, at that time, already negotiated and executed a Framework Purchase Agreement with Orient Gene. Compl. ¶ 28. For its part, Tanner had tried unsuccessfully even to make contact with Orient Gene. Compl. ¶ 38. Tanner and FSMS agreed almost immediately to a 50-50 "profit sharing" arrangement, and Tanner sent FSMS a draft Distribution Agreement reflecting that arrangement. Compl. ¶¶ 33-36.

In August 2020, FSMS informed Tanner that Orient Gene was offering a new product—an antigen rapid test kit—which could be a "game changer." Compl. ¶ 39. Tanner pitched the product to the UK Government. *Id.* The pitch went well, and Tanner urgently needed 500 units of the new Orient Gene kit to provide to the UK Government. Compl. ¶ 41. Tanner still had no relationship with Orient Gene, Compl. ¶ 38, but *FSMS* was able to procure the 500 units. Compl. ¶ 42.

Tanner thought the opportunity could be big. Compl. ¶ 46. During the first

week of September 2020, Tanner held internal discussions and determined that it would prefer to transact with Orient Gene instead of FSMS, even though it had no relationship with FSMS. Compl. ¶ 66(a). Tanner also determined that it would prefer to pay FSMS "a fee" rather than the profit split. Compl. ¶ 66(b).

On September 3, 2020, Tanner asked FSMS to modify the draft Distribution Agreement to include a provision permitting TANNER to place orders directly with Orient Gene. Compl. ¶ 64. FSMS accommodated this request and included guard-rails to protect itself. *Id.* Of relevance here:

(1) Tanner could place purchase orders with Orient Gene only "if directed by FSMS" (*id.*);

(2) the financial arrangement would be "maintained as if TANNER purchased product directly from FSMS with a 50% gross profit participation to each Party" (*id.*); and

(3) Tanner would still "collaborate with FSMS prior to quoting, shipping or otherwise distributing" and "collaborate with FSMS to set the best price to maximize the likelihood of winning the business and making a profit" (*id.*).

By September 10, although Tanner *wanted* to work directly with Orient Gene, it still had not made contact. Compl. ¶ 38. That day, Tanner's Mr. Bracey and Mr. Scalia made a plan to pressure FSMS to put Tanner in direct contact with Orient Gene by "blowing up" Mr. Mao's phone. Compl. ¶ 66(e). Executing on that plan, Mr. Bracey repeatedly texted Mr. Mao:

- "[R]eally need the account opening form signed by [Orient Gene] and a call set up with them ASAP."
- "Really need to talk with them [Orient Gene] ASAP please."
- "Need to talk with them directly[.]"

*Id.* When Mr. Cagan asked what he needed to speak to Orient Gene about, Mr. Bracey said: "Who our point of contact is - and talking with them directly. How the process works for them. Setting up our account (QA and finance matters related to that). All standard stuff that you do with a new supplier." Compl. ¶¶ 66(e), (f).

These communications did not disclose Tanner's intention to work "directly with" Orient Gene and pay FSMS "a fee," as revealed in prior, internal communications. Compl. ¶¶ 66(a)-(c). The same day, Tanner learned that the UK Government would be sharing the results of the testing on the 500 units, but decided "to have that call without Laird [Cagan]." Compl. ¶ 66(d).

After receiving Mr. Bracey's repeated text messages and phone calls, FSMS's Mr. Mao agreed to set up a video call between himself, Tanner, and Orient Gene. Compl. ¶ 66(g). But FSMS also explained that it needed the Distribution Agreement signed "pronto." *Id.* Tanner understood that if it did not sign the Distribution Agreement, it would not have access to Orient Gene, and that, without access to Orient Gene, the UK Government deal would not go forward. *Id.*

Late on September 10, 2020, relying on Tanner's promise to execute the Distribution Agreement, FSMS organized a video call among FSMS, Orient Gene, and Tanner personnel. Compl. ¶ 66(i). As the Complaint alleges: "FSMS did so because Tanner had falsely promised to collaborate with FSMS, buy products from FSMS (or, Orient Gene, but only if directed by FSMS), and honor the 50% profit split. But

37

for Tanner's promise to perform under the Distribution Agreement, FSMS would not have made the introduction." *Id.*

The call went forward on September 11, 2022. *Id.* Mr. Bourne—who had already been in discussions about Orient Gene—executed the Distribution Agreement later that day. *Id.*

On September 12, 2020, after having received the introduction to Orient Gene, Tanner's Mr. Scalia instructed Mr. Bracey *not* to return the executed contract to FSMS. Compl. ¶ 66(j). And on September 14, 2020, before delivering the Distribution Agreement, Tanner's Mr. Bracey intentionally removed FSMS personnel when responding to existing email threads so that he could communicate with Orient Gene staff without FSMS's knowledge. Compl. ¶ 66(k). Mr. Bracey also told Mr. Scalia that he would try to get Orient Gene's Chairman "on the [upcoming] call or a separate call." *Id.*

These course of actions and statements, all of which occurred in the days leading up to September 14, 2020 (when Tanner delivered the contract to FSMS), indicate that Tanner did not intend to honor the guardrails. In particular, even before delivering the Distribution Agreement, Tanner had: (1) excluded FSMS from communications about the results of testing on the 500 units instead of collaborating with FSMS; (2) decided internally to pay FSMS a "fee" instead of the 50-50 profit split; and (3) removed FSMS personnel when communicating by email with Orient Gene instead of collaborating with FSMS.

## 2. Breaches In The First Week

Tanner's and Mr. Bourne's breaches over the ensuing days confirm that they

entered into the contract with no intent to honor the guardrails of collaborating with FSMS, placing orders to Orient Gene only "if directed" by FSMS, and maintaining the 50-50 profit split.

On September 15, the UK Government reported to Tanner that the test results on the Orient Gene kits were so good that the UK Government intended to accelerate plans to acquire the Rapid Tests from Tanner and Orient Gene and requested an immediate call with Tanner and Orient Gene. Compl. ¶ 67(a). Tanner withheld this information from FSMS, contrary to its contractual promise to collaborate with FSMS. *Id.* The immediacy of this breach—the day after delivering the executed contract—indicates that Tanner never intended to honor its contractual duty to collaborate with FSMS.

On September 16, 2020, Tanner orchestrated a call between the UK Government and Orient Gene without telling FSMS, contrary to Tanner's contractual promise to collaborate with FSMS. Compl. ¶ 67(b). The immediacy of this breach—two days after delivering the executed contract—indicates that Tanner never intended to honor its contractual duty to collaborate with FSMS. *Id.*

Also on September 16, 2020, Tanner requested an "official quote" from Orient Gene for 350,000 units, contrary to Tanner's contractual promise to collaborate with FSMS and to purchase from FSMS unless "directed by FSMS" to purchase from Orient Gene. Compl. ¶ 67(c). The immediacy of this breach—two days after delivering the executed contract—indicates that Tanner never intended to honor its contractual promises to collaborate with FSMS and to purchase from FSMS unless "directed by FSMS." *Id.*

On September 17, 2020, Tanner agreed to buy 700,000 units from Orient Gene and sell them to the UK Government, contrary to Tanner's contractual promises to collaborate with FSMS and to purchase from FSMS unless "directed by FSMS" to purchase from Orient Gene. Compl. ¶ 67(d). The immediacy of this breach—three days after delivering the executed contract—indicates that Tanner never intended to honor its contractual promises to collaborate with FSMS and to purchase from FSMS unless "directed by FSMS." *Id.*

Also on September 17, 2020, internal Tanner emails show that key Tanner personnel planned to keep 100% of the gross profits from the Orient Gene transaction for Tanner, contrary to Tanner's contractual promise to split the Gross Profits with FSMS on a 50-50 basis. Compl. ¶ 67(e). The immediacy of this breach—three days after delivering the executed contract—indicates that Tanner never intended to honor its contractual promises to maintain the 50-50 profit split.

On September 18, 2020, Mr. Scalia reported to Mr. Bourne that he was planning to "readjust our deal with [FSMS's Mr. Cagan] now that we're slick with him." Compl. ¶ 69. The fact that Mr. Scalia and Mr. Bourne were discussing a plan to "readjust" the deal four days after entering into the contract supports the inference that Tanner entered into the contract with no intention of performing. *Id.* Mr. Scalia's use of the phrase "now that we're slick with him" indicates that he believed he had skillfully manipulated FSMS's Mr. Cagan—like a slick used car salesman. *Id.*

These breaches and internal communications—all within a few days of entering into the contract—reveal that Tanner did not intend to honor the guardrails when it delivered the contract. In *Interstate Narrow Fabrics*, 218 F.R.D. at 466, the court

held that a jury "could reasonably find that [defendant] executed the Agreement with the intention of breaching it" based on evidence that defendant's "potentially breaching purchases occurred very soon after execution of the Agreement." So too here.

In reaching its September 2023 decision, the Court focused on the allegation that Tanner paid $6.5 million (out of more than $160 million owed) to FSMS, holding that "partial performance under a contract is evidence of the defendant's intent to fulfil the agreement when formed." Order at 13 (Sept. 30, 2023), ECF 117.

But the timing of certain events leading up to *those* payments—events that were not disclosed until discovery—casts them in a new light. As noted above, even before delivering the contract, Tanner determined that it "need[ed] to" "pay [FSMS] a fee" (Compl. ¶ 66(b)), and within days of delivering the contract Tanner was already planning to keep all the profits for itself and "readjust" the deal (Compl. ¶ 69). This happened on September 17 and 18. *Id.* Yet, no one from Tanner came up with the idea of using a $5.00 unit cost to calculate the Gross Profit spit until sometime *after October 5, 2020*, when Tanner began consulting with William Boddy, a litigation partner at the McGuire Woods law firm, about the FSMS Distribution Agreement. Compl. ¶ 71. Thus, Tanner's payment on the basis of a $5.00 per unit price—in November 2020 and February 2021—does *not* necessarily reflect its intentions when it executed and delivered the contract on September 14, 2020. Rather, a jury could conclude that its use of the $5.00 unit cost was a stratagem developed by litigation counsel as a way of lulling FSMS into a false sense of complacency.

Given the new allegations—based on evidence unavailable to FSMS before merits discovery took place—the best that can be said for Tanner and Mr. Bourne is

that there is *conflicting* evidence on their intent to perform as of September 14, 2020. And given the Court's duty to draw all reasonable inferences in plaintiff's favor, the UDTPA claim should go forward.

## IV. FSMS States Voidable Transfer Claims Against TPUK

TPUK argues that the North Carolina UVTA can only be asserted against a transferee, as opposed to TPUK, the transferor. This is an improper argument for a defendant to make who promised *to make no distributions without leave of court*. *See* Order at 3 (Oct. 16, 2023) ECF 39 (citing ECF 27 at 2) (No. 23-cv-598). TPUK is incorrect. North Carolina law allows for voidable transfer claims to be asserted against the transferor. In *Ehmann*, 2022 NCBC 55, 2022 WL 4462356, the North Carolina Business Court denied a motion to dismiss UVTA claims asserted against both a transferor and transferee, holding that "[t]he UVTA, formerly the Uniform Fraudulent Transfer Act, allows a creditor to bring a civil against a debtor for certain transfers made by the debtor." *Id.* at *12. Notably, the UVTA statute itself allows a creditor (*i.e.*, FSMS) to seek "an injunction against further disposition **by a debtor or a transferee, or both,** of the asset transferred or of other property." N.C. Gen. Stat. § 39-23.7(a) (emphasis added); (*see also* Compl. at 46 (seeking such injunctive relief)).

For its contrary argument, TPUK relies (ECF 29 at 31) on two federal bankruptcy cases. ECF 29 at 31 (citing *Rainsdon v. Kirtland (In re Kirtland)*, 2011 WL 4621959, at *1 (Bankr. D. Idaho Sept. 30, 2011), and *Haux v. Gerson (In re Gerson)*, 35 B.R. 129, 130 (B.A.P. 9th Cir. 1983). Those cases do not speak to North Carolina law. The Court should reject TPUK argument that the UVTA claim can only be

asserted against its transferees and make clear that the injunction continues.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motions.

This the 10th day of April, 2025.

/s/ Kent A. Yalowitz
Kent A. Yalowitz (admitted *pro hac vice*)
N.Y. State Bar No. 2188944
Carmela T. Romeo (admitted *pro hac vice*)
N.Y. State Bar No. 5058151
**ARNOLD & PORTER**
  **KAYE SCHOLER LLP**
250 W 55th Street
New York, NY 10019
212-836-8000
kent.yalowitz@arnoldporter.com
carmela.romeo@arnoldporter.com

– and –

Eliseo R. Puig (admitted *pro hac vice*)
Colorado State Bar No. 49022
**ARNOLD & PORTER**
  **KAYE SCHOLER LLP**
1144 Fifteenth Street, Suite 3100
Denver, CO 80202
303-863-1000
eliseo.puig@arnoldporter.com

/s/ Lex M. Erwin
Lex M. Erwin
N.C. State Bar No. 34619
David A. Luzum
N.C. State Bar No. 41398
Kevin Y. Zhao
N.C. State Bar No. 53680
**MAYNARD NEXSEN PC**
227 W. Trade Street, Suite 2300
Charlotte, NC 28202
Telephone: (704) 339-0304
Facsimile: (704) 338-5377
lerwin@maynardnexsen.com
dluzum@maynardnexsen.com
kzhao@maynardnexsen.com

*Counsel for Plaintiff*

# CERTIFICATION

Pursuant to the Court's June 18 2024 Standing Order regarding Use of Artificial Intelligence, the undersigned certifies that:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line research sources WestLaw, Lexis, FastCase, and Bloomberg;

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

*/s/ Lex M. Erwin*
Lex M. Erwin