## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

FS MEDICAL SUPPLIES, LLC,

      Plaintiff,

v.

TANNERGAP, INC. *et al.*,

      Defendants.

Civil Action No.
3:25-cv-102-MOC-WCM

### PLAINTIFF'S OBJECTION TO FEBRUARY 3, 2026 MEMORANDUM AND RECOMMENDATION TO DISMISS FOR LACK OF DIVERSITY JURISDICTION

The M&R recommends dismissal of this case without prejudice for lack of subject matter jurisdiction (ECF 49). Plaintiff objects.

This is the third matter in this District between these parties. The first was filed in 2021, and the second in 2023, both invoking the Court's diversity jurisdiction. (Judge Conrad termed those cases *Tanner I* and *Tanner II*, respectively, and Plaintiff follows that nomenclature.) Discovery closed in those cases in December 2024. In February 2025, Plaintiff filed an Amended Citizenship Disclosure because the undersigned had discovered that when Plaintiff (an LLC) filed *Tanner I* and *Tanner II*, one of its members, Zhen Zhen Tong, was a citizen of China. Defendants then successfully moved to dismiss *Tanner I* and *Tanner II* without prejudice. M&R at 3. FSMS appealed and that appeal is set for oral argument March 25, 2026.

On the day that FSMS filed its Amended Citizenship Disclosure, Ms. Tong transferred all her FSMS units to her husband and fellow member, Jim Mao, by a written assignment. Ex. A [ECF 37-3]. FSMS filed the complaint in this case the next day. All agree that there was complete diversity at the commencement of this case. The question here is whether 28 U.S.C. § 1359 forbids jurisdiction.

The statute reads:

> A district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court.

28 U.S.C. § 1359. Dismissal under this statute is inappropriate for two independent reasons.

**First,** the statute does not apply where an already-existing LLC drops a non-diverse member because, in that circumstance, no party was "*made* or *joined* to invoke the jurisdiction" of a federal court. FSMS was "made" when it was formed in 2020, nearly five-years before the filing of this lawsuit, and not for the purpose of invoking federal court jurisdiction. As the Second Circuit explained in a case presenting the exact same fact pattern as this one, "it strains the word" to say that an LLC was "'made'" or "caused itself to be made a party by dropping its non-diverse members." *Castillo Grand, LLC v. Sheraton Operating Corp.*, 719 F.3d 120, 125 (2d Cir. 2013) (punctuation omitted).

**Second,** under controlling Fourth Circuit and Supreme Court law, two conditions are necessary to trigger the statute: there must be "a lack of a stake in the outcome *coupled with* the motive to bring into a federal court a local action normally triable only in a state court." *In re Bestwall LLC*, 71 F.4th 168, 180 (4th Cir. 2023) (quoting *Lester v. McFaddon*, 415 F.2d 1101, 1106 n.11 (4th Cir. 1969) (emphasis added)). Put another way, the statute applies if the plaintiff is "[1] a straw party…[2] appoint[ed] for the purpose of creating apparent diversity of citizenship.'" *Bestwall*, 71 F.4th at 181 (quoting *Lester*, 415 F.2d at 1103-04). "If either factor is missing, the suit is not collusive or improper." *Lester*, 415 F.2d at 1106 n.11.

FSMS is not a straw party. Defendants dealt with FSMS as an entity with independent business interests in 2020, before the claims arose. FSMS has a real stake in the outcome. Its rights

arose out of its own business transactions, and its injuries are its own injuries. It is prosecuting its own claims in its own name.

## FACTUAL BACKGROUND

This case arises from a contractual relationship between FS Medical Supplies, LLC ("FSMS"), TannerGAP, Inc., and Tanner Pharma UK Limited ("TPUK," and together with TannerGAP, Inc., "Tanner") formed in the early days of the COVID-19 pandemic. Complaint ¶ 1 [ECF 1]. In June 2020, Tanner entered into a contract promising that no Tanner affiliate would circumvent FSMS by dealing directly with manufacturers secured by FSMS. *Id.* ¶¶ 29, 39. One such manufacturer was Zhejiang Orient Gene Biotech Co. Ltd., a well-respected Chinese manufacturer of medical devices. *Id.* ¶¶ 26-28. Over the spring and summer of 2020, Tanner had made attempts to contact Orient Gene, but those efforts had failed. *Id.* ¶ 38.

On August 21, 2020, FSMS informed Tanner that Orient Gene was offering a new product—an antigen rapid test kit. *Id.* ¶ 40. FSMS predicted that the new product would be a "game changer." *Id.* Five days later Tanner pitched the Orient Gene test kits to the UK Government. *Id.* To facilitate the pitch, FSMS bought 500 sample units of the product and worked closely with Tanner to have them shipped to the UK Government for testing. *Id.* ¶¶ 43-45. By September 9, the product had passed the "first stage" of validation. FSMS promptly ordered another 4,250 test kits for delivery to the UK Government for field testing—the second stage of validation. *Id.* ¶¶ 47-48.

During the first half of September, FSMS and Tanner negotiated a Distribution Agreement and, on September 14, Tanner delivered the executed Distribution Agreement to FSMS. *Id.* ¶¶ 51, 66. Tanner promised to buy products from FSMS and split the gross profits 50-50. Tanner also promised to collaborate with FSMS on pricing, negotiations with manufacturers, and other matters. As requested by Tanner, the Distribution Agreement included a provision permitting Tanner to

3

place orders with Orient Gene, but it included guard rails to protect FSMS, including that (1) such purchase orders would only be placed "if directed by FSMS" (§ 7); (2) the financial arrangement outlined in the contract "shall be maintained as if Tanner purchased product directly from FSMS with a 50% gross profit participation to each Party" (§ 10); and (3) all remaining provisions of the contract would continue to apply, such as Tanner's obligations to "collaborate with FSMS prior to quoting, shipping or otherwise distributing" the products "in any country for the first time," and at all times "collaborate with FSMS to set the best price to maximize the likelihood of winning the business and making a profit" (§§ 7.1, 10). *Id.* ¶ 64.

Evidence developed in discovery in *Tanner I* and *Tanner II* shows that Tanner and Mr. Bourne did not intend to honor the Distribution Agreement when they entered into the contract on September 14. *Id.* ¶ 66. For example, as early as September 10, Tanner's internal documents show that senior Tanner executives internally set a plan to pressure FSMS to put Tanner in direct contact with Orient Gene by "blowing up" the phone of FSMS principal, Jim Mao. *Id.* ¶ 66(e). Internal Tanner emails also reveal that Tanner personnel were already approving *Orient Gene* as a vendor in their system *rather than FSMS*. *Id.* ¶ 66(h). And even before Tanner delivered the Distribution Agreement to FSMS, Tanner executives intentionally removed FSMS personnel when responding to existing email threads so that they could communicate with Orient Gene staff without FSMS's knowledge. *Id.* ¶ 66(k).

Within a day of delivering the contract on September 14, Tanner began withholding important facts from FSMS. Tanner learned on September 15 that the UK Government intended to accelerate plans to acquire the tests from Tanner and Orient Gene, and that the UK Government requested an immediate call with Tanner and Orient Gene. *Id.* ¶ 67(a). Tanner did not disclose these facts to FSMS. *Id.* Two days after delivering the contract, Tanner requested an "official

4

quote" from Orient Gene—without telling FSMS. *Id.* ¶¶ 67(b), 67(c). Three days after delivering the contract, Tanner agreed to buy 700,000 units from Orient Gene—again without telling FSMS. *Id.* ¶¶ 67(d), 67(e). And four days after delivering the contract, Tanner executives said internally that they were planning to "readjust our deal with [FSMS's CEO] now that we're slick with him." *Id.* ¶ 69. Merely a week after delivering the contract—and again without informing FSMS—Tanner began planning a "renegotiation strategy" for dealing with FSMS. *Id.* ¶ 70.

Less than two weeks after delivering the contract, Tanner began executing contracts and placing purchase orders with Orient Gene—again without telling FSMS. *Id.* ¶¶ 71-76. During the course of September and October, Tanner bought millions of units from Orient Gene for sale to the UK Government, but failed to inform FSMS. *Id.* ¶¶ 76, 81. To the contrary, throughout September and October 2020, FSMS repeatedly asked for updates about how the phase two testing was going on 4,250 units, and Tanner repeatedly said that the testing was incomplete without mentioning the high volume of activity among Tanner, the UK Government, and Orient Gene. *Id.* ¶¶ 77-88. In October 2020, Tanner falsely told FSMS that it had bought 2 million units from Orient Gene at a price of $5.00 per unit. The real price was less. *Id.* ¶¶ 90-92. In a follow-up video call, Tanner admitted that it had lied about the price, but refused to disclose the actual price and withheld information from FSMS. *Id.* ¶¶ 96-97. In November 2020 and again in February 2021, Tanner sent FSMS "reconciliation statements" with false information in them, claiming that Tanner paid $5.00 per unit. *Id.* ¶¶ 96, 99.

While withholding information about the true gross profits and volumes, Tanner told FSMS it was owed only $6.5 million, and FSMS took what Tanner said it owed. *Id.* ¶ 171. By sending this relatively small amount to FSMS, Tanner attempted to lull FSMS such that it would not further inquire into the true revenues and costs to determine the profit split to which it was owed. This

was part of Tanner's and Mr. Bourne's scheme to deceive FSMS. *Id.* ¶ 172. When pressed by FSMS to provide documents substantiating the actual cost paid to Orient Gene for test kits, Tanner repeatedly refused to provide the information. *Id.* ¶ 173. Tanner's executives understood that if they disclosed the actual cost paid to Orient Gene, FSMS would discover that Tanner had wrongfully withheld millions of dollars in profits owed to FSMS. *Id.*

While this was going on, TPUK began transferring millions of dollars in cash to Mr. Bourne. On December 23, 2020, Tanner made a large cash transfer to Mr. Bourne. *Id.* ¶ 111. In January and February 2021, TPUK transferred an additional $61 million to Mr. Bourne. *Id.* ¶ 112. TPUK made additional multi-million dollar cash transfers to Mr. Bourne in April and July of 2021 and in February, March, and May of 2022. *Id.* ¶¶ 113-19. The transfers ultimately totaled more than $200 million. Mr. Bourne exercised complete domination and control over Tanner, and he alone determined the amounts and timing of these transfers, *id.* ¶¶ 121, 131-50.

Even after FSMS sued Tanner, Mr. Bourne continued to transfer millions of dollars from TPUK to himself both in the form of "dividends" and in the form of undocumented "loan repayments." *Id.* ¶ 123. The transfers at times left Tanner without enough money to manage its affairs, so Mr. Bourne "lent" money back to TPUK in an arrangement that one senior Tanner executive called "odd and unnecessary." *Id.* ¶ 124. TPUK was required by law to disclose dividends in its annual financial statements, but Tanner delayed that filing to hide the truth from FSMS. *Id.* ¶ 120.

Ultimately, Tanner sold more than $1.25 *billion* worth of products procured from Orient Gene to the UK Government; FSMS seeks $387 million in damages. *Id.* ¶ 4.

6

## PROCEDURAL HISTORY

### The California Case

FSMS sued TannerGAP and TPUK for breach of contract in state court in California on March 24, 2021. Defendants removed the case to federal court stating that they were citizens of North Carolina and the United Kingdom. Ex. B [Notice of Removal ¶ 12 (Apr. 26, 2021)]. As a limited liability company, FSMS takes the citizenship of all its members. At the time of removal, its members were its two principals, Laird Cagan and Jim Mao, and each of their spouses. The families lived in Texas and California. But unbeknownst to any counsel in the case, Mr. Mao's spouse, Zhen Zhen Tong, was a permanent U.S. resident, not a U.S. citizen. M&R at 3 (ECF 49).

The federal court in California dismissed for lack of personal jurisdiction. Ex. C [Order (July 12, 2021)].

### The WDNC Cases

FSMS refiled its case as *Tanner I* in this Court on September 23, 2021. Ex. D [Compl. (Sept. 23, 2021), No. 21-cv-501]. The parties conducted jurisdictional discovery between January 2022 and August 2022 but did not discover the permanent-resident status of Ms. Tong. FSMS amended its Complaint on August 12, 2022. Ex. E [Am. Compl. (Aug. 12, 2022)]. In September 2023, Judge Conrad denied Defendants' threshold Rule 12 procedural motions and their motion directed to FSMS's contract claims and allowed the motion as to its Unfair and Deceptive Trade Practices claim. Ex. F [Order (Sept. 30, 2023)]. In the meantime, as noted above, FSMS learned of Mr. Bourne's asset-stripping activities and, on September 20, 2023, filed *Tanner II*. Ex. G [Compl. (Sept. 20, 2023), No. 23-cv-598]. FSMS amended its Complaint in *Tanner II* on October 5, 2023. Ex. H [Am. Compl. (Oct. 5, 2023)].

7

During discovery in *Tanner I* and *Tanner II*, the parties exchanged more than 100,000 documents and took 32 depositions. The court resolved eight motions to compel or for protective orders, many presenting multiple discovery issues. *See* Exs. I, J, K, L [ECF 146, 166, 208, 232 (No. 21-cv-501)]. Discovery closed December 20, 2024. At the time discovery closed, several motions were pending—most important, two motions directed to the pleadings. Two weeks before the close of discovery, Magistrate Judge Metcalf had granted Defendants leave to amend their answers to allege a counterclaim sounding in fraudulent inducement. Ex. L [Order at 5-7 (Nov. 26, 2024)]. FSMS had opposed that motion as futile, but Magistrate Judge Metcalf expressly reserved the question whether the allegations stated a claim on which relief could be granted, *id.* at. 7, and FSMS promptly filed a motion to dismiss, Ex. M [Mot. (Nov. 27, 2024)]. In addition, FSMS promptly filed its own motion to amend its complaint to conform to the facts learned in merits discovery. Ex. N [Mot. (Dec. 3, 2024)].

**The Assignment**

On February 10, 2025, soon after counsel for FSMS learned of Ms. Tong's citizenship, FSMS filed an amended citizenship disclosure in *Tanner II*. Ex. O. Also on February 10, 2025, Ms. Tong assigned all her right, title, and interest in and to her FSMS voting units to her husband, Jim Mao (one of the two FSMS principals). Ex. A [ECF 37-3]. The assignment, which is in writing and signed by Ms. Tong, is absolute and unconditional. *Id.*

**Dismissal of *Tanner I and Tanner II***

On October 1, 2025, the Court dismissed *Tanner I* and *Tanner II* without prejudice for lack of subject matter jurisdiction, concluding that there was not complete diversity. M&R at 3 (ECF 49). FSMS appealed. *Id.* The appeal is fully briefed and set for oral argument on March 25, 2026 in the Fourth Circuit Court of Appeals.

**The M&R**

The M&R recommends dismissing this case without prejudice for lack of subject-matter jurisdiction. It first concludes that the Court should use a multi-factor test to decide whether § 1359 applies. M&R at 6. The M&R observes that "some factors support FSMS's argument that the Assignment did not run afoul of Section 1359," namely that on its face the Assignment was "a complete transfer of all of Ms. Tong's membership interest in FSMS," and "*not* an assignment of the entity's interest in its claims against Defendants, which interest FSMS continued to hold after the Assignment." *Id.* at 10 (emphasis added). However, the M&R concludes that these factors were outweighed by "FSMS's intent" because "the purpose of the Assignment was to ensure that the Court would have diversity jurisdiction in this case." M&R 10-11.

The M&R acknowledges that the Second Circuit read the statute differently in *Castillo Grand*, a case involving the same fact-pattern as this one, in which a plaintiff LLC dropped two non-diverse members shortly before the LLC filed a new complaint. The M&R quotes passages of the Second Circuit's opinion, which focuses *not* on the question of intent, but on the text of the statute. In particular, the M&R quotes the Second Circuit's view that " 'it strains the word ["made"] to say that [an LLC] "made" a party (or caused itself to be made a party) by dropping its non-diverse members.' " *Id.* at 16 (quoting *Castillo Grand*, 719 F.3d. at 125). The M&R concludes, however, that the Second Circuit's decision does not "directly answer[] the question presented" here, because the Second Circuit "did not need to 'rule definitively on the coverage of Section 1359.' " *Id.* at 16-17 (quoting *Castillo Grand*, 719 F.3d at 126). The M&R therefore recommends dismissal without prejudice under § 1359 because Ms. Tong's transfer "was completed for the purpose of creating diversity jurisdiction where none had existed." M&R at 18.

<u>**STANDARD OF REVIEW**</u>

When considering a party's objections to an M&R, the Court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). The Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.*; Fed. R. Civ. P. 72. Whether the "undisputed facts establish a lack of subject matter jurisdiction is a legal determination subject to *de novo* appellate review." *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768-69 (4th Cir. 1991).

<u>**ARGUMENT**</u>

Section 1359 does not apply for two independent reasons: (1) dropping a non-diverse LLC member does not fall within the statute's express textual requirement that a party be "made or joined to invoke the jurisdiction of [the] court," and (2) FSMS did not act "improperly or collusively" within the meaning of the statute.[1]

**I.  FSMS Was Not "Made or Joined To Invoke The Jurisdiction" Of The Court**

Dropping a non-diverse LLC member does not come within the express terms of § 1359, because the words "made or joined" do not encompass the transfer of a membership interest in a pre-existing LLC, as the Second Circuit explained in *Castillo Grand*, 719 F.3d at 125.

**A.** The Second Circuit's analysis of § 1359 is correct. There, as here, the plaintiff dropped allegedly non-diverse members and refiled an otherwise identical action in federal court. *Id.* at 122. The district court dismissed the new case under § 1359 and sanctioned the plaintiff for purportedly violating § 1359. *Id.* at 122-23. The Second Circuit reversed the sanction as an abuse of

---

[1] FSMS expressly preserves its contention that there is a third reason why the M&R is incorrect: There was always diversity between the parties—an issue currently on appeal to the Fourth Circuit.

discretion, explaining that "the [district] Court deemed Castillo to have violated section 1359 because the non-diverse members were dropped for the purpose of creating jurisdiction. As we have pointed out, however, that action does not appear to fit within the literal wording of the actions proscribed by section 1359." *Id.* at 126. More specifically, the Second Circuit explained: "As used in [Section 1359], the word ['made'] seems to have two possible meanings. It could mean that a party was 'made' in the sense of being created. Or, with only the slightest rearrangement of the text, it could mean that a person was 'made to become a party.' " *Id.* at 125. As to the sense of "being created," the Second Circuit pointed to *Lehigh Mining & Manufacturing Co. v. Kelly*, 160 U.S. 327, 342 (1895), in which a corporation was created for the purpose of becoming a party in a diversity action, which, the Supreme Court said, " 'should be regarded as a case of an improper and collusive *making of parties* for the purpose of creating a case cognizable in the [federal] court.' " *Id.* (quoting *Lehigh*, 160 U.S. at 342) (emphasis and alterations by the Second Circuit). As to the sense of "made to become a party," the Second Circuit pointed to the Fourth Circuit's decision in *Lester*. *Castillo Grand*, 719 F.3d at 125. In *Lester*, the plaintiff was an administrator appointed "for the purpose of bringing an action for wrongful death in the federal court's diversity jurisdiction"—and no other duties. *Lester*, 415 F.2d at 1103. An administrator appointed for a single purpose can be said to have been "made to become a party;" in contrast, the Second Circuit reasoned, an LLC which drops a member has not been "made to become a party" because "it strains the word to say that [the LLC] 'made' a party (or caused itself to be made a party) by dropping its non-diverse members." *Castillo Grand*, 719 F.3d at 125.

Here, it is beyond dispute that FSMS was "made in the sense of being created" years before this case was filed, for the purpose of bringing personal protective equipment manufactured in China to market during the early days of the pandemic. ECF 37-1 (Mao Dep. 69:20-23), ECF 37-

2 (Cagan Dep. 38:17-39:21). It is also beyond dispute that FSMS was not "made to become a party" like the administrator in *Lester*. FSMS's rights arose years before it filed this case and it sued to vindicate those rights. Because of these undisputed facts, § 1359 simply does not apply.

**B.** The M&R does not say that the Second Circuit's textual analysis is unpersuasive—merely that the *Castillo Grand* court did not need to "'rule definitively'" because there was an alternative basis to reverse the district court's sanction. M&R at 16 (quoting *Castillo Grand*, 719 F.3d at 126). This point sidesteps the statutory text in favor of a freewheeling multi-factor test that the M&R says "courts have considered" when applying § 1359 "to assignments." M&R at 6. For this test, the M&R relies principally on *Kramer v. Caribbean Mills, Inc.*, 394 U.S. 823 (1969), which involved the assignment of a claim to a straw party—a textbook case of a party being "made" (i.e., "made to become a party"). Like the administrator in *Lester*, the assignee in *Kramer* took the assignment in order "nominally, at least, to prosecute the action in his own name." *See Lester*, 415 F.2d at 1105 (discussing *Kramer*).

The question here is whether an LLC is "made to become a party" when a member is dropped. Defendants concede (ECF 39 at 13-14) that this fact-pattern raises a different question than cases like *Kramer* and *Lester*, which involved parties who had no previous relationship to the underlying events giving rise to litigation and therefore were "made to become a party." We have found only three cases that address the fact-pattern presented here. The first is *Castillo Grand*, in which the Second Circuit persuasively assessed the statutory text and concluded that § 1359 does not bar jurisdiction when an LLC drops non-diverse members. The defendants relied heavily on the *district court* decision in that case and did not even cite the Second Circuit decision rejecting the district court's reasoning and reversing its sanction as an abuse of discretion. *See* ECF 27. Yet that is the only decision in any court to have considered the question at hand with reference to the

actual text of the statute. The other two cases simply followed the district court decision in *Castillo Grand*. The first was decided before the Second Circuit issued its opinion rebuking the district court. *Gulf Fleet Tiger Acquisition, L.L.C. v. Thoma-Sea Ship Builders, L.L.C.*, 282 F.R.D. 146, 157 (E.D. La. 2012). The second followed the district court decision in *Castillo Grand* but inexplicably did not even cite the Second Circuit's decision in that case—that case made the same mistake Defendants made in their moving papers by citing a reversed trial court decision. *See Bugsby Prop. LLC v. Alexandria Real Est. Equities, Inc.*, 2020 WL 1974147, at *4 (S.D.N.Y. Apr. 24, 2020). Those two decisions are therefore unpersuasive.

**C.** Defendants tried to attack the persuasiveness of the Second Circuit's reasoning by taking a "journey through [three] dictionaries" from the 1940s and later. ECF 39 at 8-9. That attempt missed the mark, and the M&R was correct to disregard it. To be sure, dictionaries are useful in statutory interpretation because courts interpret the words of a statute "consistent with their ordinary meaning at the time Congress enacted the statute." *Wisconsin Cent. Ltd v. United States*, 585 U.S. 274, 277 (2018) (internal quotation marks omitted). Here, Congress enacted the text now codified at § 1359 in 1875, using the word "made" as the past participle of the transitive verb "make." *See* Ch. 137, § 5, 18 Stat. 472 ("the parties to said suit have been improperly or collusively made or joined"). In and around 1875, that word was defined as:

> Make, *v.t.* [made; making.] [A.S. *macian*.] 1. To cause to exist; to produce; to frame; to fashion; to create: hence, to construct: to effect; to do; to gain. 2. To cause to be or become. 3. To esteem, or represent. 4. To require; to compel. 5. To compose; to constitute; to form. 6. To reach or arrive at.

MAKE, Noah Webster, *A Dictionary of the English Language* at 261 (1868); *accord* MAKE, Noah Webster, *A Dictionary of the English Language* at 261 (1881); *see* MAKE, Noah Webster, *An American Dictionary of the English Language* at 802 (1865) (similar).

When a word has more than one sense, courts "look to the context in which the word is used." *Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 13 (2015); *Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 596-97 (2004). Here, the senses that could apply in the context of the statute are the ones that the Second Circuit identified—senses 1 and 5 (cause to exist, produce, frame, fashion, create, compose, constitute, or form—and sense 2 ("cause to be or become"). The other senses do not parse in this context.

For their part, Defendants offered snippets from dictionaries of the 1940s. This was a basic error as the statutory language was originally enacted in 1875. Courts will not presume that the 1948 revision of the Judicial Code "worked a change in the underlying substantive law unless an intent to make such a change is clearly expressed." *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 136 (2008) (cleaned up). And even if Defendants' definitions reflected established meaning in 1875 rather than linguistic drift, when read in full (rather than as snippets without context) the definitions either confirm the Second Circuit's analysis,[2] or do not parse in the context of the statute.[3]

Jurisdictional statutes, like other statutes, should be applied as written, with neither "a more expansive" nor a "narrower" construction "than what the text provides." *Exxon Mobil Corp. v.*

---

[2] Thus: Sense 2: "To form by an assembling of individuals; as, twice one *makes* two; also, to enter in as, or count as; as, he *made* the thirteenth at the table"; and Sense 19: "To be, or to be capable of being, changed or fashioned into; as, wool makes warm clothing." MAKE, *Webster's Collegiate Dictionary* at 604 (1943).

[3] Thus: Sense 5: "To form the essential being of," where the full quote is "To form the essential being of; as, one swallow does not make a summer"; and Sense 19: "to cause (someone) to go or come (to some specified state)" where the explanation is: "as, he was made to death; — now commonly in the intransitive form, to make away with." *Id.*

*Allapattah Servs., Inc.*, 545 U.S. 546, 558 (2005) (citation omitted). That is what the Second Circuit did in *Castillo Grand*. It applied the text as written—no more, no less. The Court should do the same here.

## II.    FSMS Did Not Act "Improperly or Collusively"

Independently, the fact that FSMS dropped a non-diverse member does not constitute impropriety or collusion—notwithstanding the motive for doing so—because FSMS (and only FSMS) has a stake in the outcome. Where it applies, § 1359 forbids sham transactions to create diversity; it does not bar jurisdiction over a suit by the *real* owner of a claim, even if that owner acquired the claim with a motive to invoke the jurisdiction of a federal court. The "common thread" for dismissal is a "lack of a stake in the outcome *coupled with* the motive to bring into a federal court a local action normally triable only in a state court." *Bestwall*, 71 F.4th at 180 (quoting *Lester*, 415 F.2d at 1106 n.11) (emphasis added). "If either factor is missing, the suit is not collusive or improper." *Lester*, 415 F.2d at 1106 n.11 (citing *Crawford v. Neal*, 144 U.S. 585, 593 (1892)). As the Supreme Court put it in *Crawford*, "the mere existence of the wish to bring suit in the United States court, as a motive for the purchase of these judgments, is not enough, if the purchase was in fact made." 144 U.S. at 594.

FSMS does not suffer from a "lack of a stake in the outcome." *Bestwall*, 71 F.4th at 180. It is the real party in interest, not a "straw party." *Id.* at 180-81. It did business with Tanner and filed suit for redress of injuries caused by Tanner *to FSMS* itself.

**A**. When Congress enacted § 1359's predecessor in 1875, "[t]he principal object of the statute was…to prevent fraudulent and collusive attempts" to invoke federal jurisdiction in cases where the transfer was merely "colorable," with "the original owner still retaining an interest in the property or choses in action transferred, or taking a contract for a retransfer of the same to

himself after the termination of the litigation." *Nashua & L.R. Corp. v. Bos. & L.R. Corp.*, 136 U.S. 356, 374 (1890). As the Fifth Circuit put it, the statute was "designed to prevent the litigation of claims in federal court by suitors who by sham, pretense, or other fiction acquire a spurious status that would allow them to invoke the limited jurisdiction of the federal courts." *Nolan v. Boeing Co.*, 919 F.2d 1058, 1067 (5th Cir. 1990).

The two-factor rule synthesized in *Lester* was consistently articulated and enforced by the Supreme Court: On the one hand, cases were dismissed when the plaintiff was not the real owner of the claim, *and* the transferor made the transfer for the purpose of invoking federal jurisdiction. Thus, in *Williams v. Nottowa*, 104 U.S. 209, 211 (1881), the Court dismissed because the plaintiff obtained bonds "solely for the purpose of collection" and "for [the] account" of a non-diverse owner. In *Farmington Village Corp. v. Pillsbury*, 114 U.S. 138, 145-46 (1885), the Court dismissed because citizens of Maine who owned bonds issued by a Maine corporation transferred them to a citizen of Massachusetts in exchange for a 50% interest in whatever he could recover, so "the transfer of the coupons was 'a mere contrivance, a pretense, [and] the result of a collusive arrangement." And in *Little v. Giles*, 118 U.S. 596, 597-98 (1886), the Court dismissed because the real parties in interest executed a "pretended deed" to a relative for the purpose of carrying out a "fraudulent scheme" and manufacturing diversity jurisdiction.

On the other hand, cases were *not* dismissed when the plaintiff *was* the real owner of the claim, *even if* the plaintiff acquired the claim with the purpose of invoking federal jurisdiction. Thus, in *Cross v. Allen*, 141 U.S. 528, 533 (1891), the Court upheld jurisdiction because the plaintiff acquired his rights "for a valuable consideration, and, the pecuniary interest of the transferrer in the subject-matter of the transfer … terminated," holding that "it makes no difference that by such transaction the transferee acquired the advantage of suing in the federal court." Similarly, in

*South Dakota v. North Carolina*, 192 U.S. 286, 270, 310 (1904), the Court upheld jurisdiction because the State of South Dakota had good title to the bonds at issue, which "were given outright and absolutely to the state," so that "the motive with which [the] gift [was] made, whether good or bad, does not affect its validity or the question of jurisdiction." And in *Williamson v. Osenton*, 232 U.S. 619 (1914), in which the plaintiff changed her state of citizenship "in order that she might institute this suit against the defendant in the United States court," the Court held that "the motive for the change was immaterial; for … the plaintiff had a right to select her domicil[e] for any reason that seemed good to her." *Id.* at 624-25.[4]

Congress carried the 1875 language forward when it revised the Judicial Code in 1948. *See* Ch. 646, § 1359. 62 Stat. 935. The Supreme Court confirmed that the 1948 revision did not affect a change when it addressed the revised statute by applying "decisions of this Court under the [1875] predecessor statute" as "squarely in point." *Kramer v. Caribbean Mills, Inc.*, 394 U.S. 823, 826-28 (1969). In *Kramer*, the named plaintiff paid $1 for a claim while promising to pay 95% of his net recovery on the assigned cause of action. *Id.* at 824. "When the assignment to Kramer is considered together with his total lack of previous connection with the matter and his simultaneous

---

[4] *Accord Wheeler v. City & Cnty. of Denver*, 229 U.S. 342, 351 (1913) ("the cases are numerous in which it has been decided that the motives of litigants in seeking Federal jurisdiction are immaterial"); *Miller & Lux v. E. Side Canal & Irrigation Co.*, 211 U.S. 293, 304 (1908) (federal jurisdiction "when based on diverse citizenship, cannot be questioned upon the ground *merely* that a party's motive in acquiring citizenship in the state in which he sues was to invoke the jurisdiction of a Federal court") (emphasis by the Court); *Dickerman v. N. Tr. Co.*, 176 U.S. 181, 191-92 (1900) ("[I]f the conveyance appear to be a real transaction, the court will not, in deciding upon the question of jurisdiction, inquire into the motives which actuated the parties in making the conveyance."); *Bd. of Comm'rs of Lake Cnty. v. Dudley*, 173 U.S. 243, 254 (1899) (a plaintiff who "really purchased" his rights can sue in diversity "without reference to … the motive that may have induced him"); *Lehigh Min. & Mfg. Co. v. Kelly*, 160 U.S. 327, 333 (1895) ("The motives which induced him to make the contract, whether justifiable or censurable, can have no influence on its validity.") (quoting *McDonald v. Smalley*, 26 U.S. (1 Pet.) 620, 624 (1828)); *Crawford*, 144 U.S. at 593 ("[I]f the transfers were absolute, and the judgment creditors parted with all their interest for good consideration, then the mere fact that one of the motives of the purchase may have been to enable the purchaser to bring suit in the United States court would not be sufficient to defeat the jurisdiction.").

17

reassignment of a 95% interest back to P[a]nama, there can be little doubt that the assignment was for purposes of collection." *Id.* at 827. The Supreme Court held that *Kramer* was "indistinguishable from *Farmington* and other decisions of like tenor." *Id.* at 827 & n.8 (1969) (citing *Williams* and *Little*).

To be sure, the Court in *Kramer* pointed out that the assignment was in substantial part "motivated by a desire…to make diversity jurisdiction available." *Id.* at 828. But that was *always* part of the analysis. *See supra* p. 16 (discussing *Williams*, *Farmington*, and *Little*). It remains so today. *Lester*, 415 F.2d at 1106 n.11. But the motive must be "coupled with" a "lack of a stake in the outcome," because "[i]f either factor is missing, the suit is not collusive or improper." *Id.*; *Bestwall*, 71 F.4th at 180 (§ 1359 applies "when a nominal party has no real stake in the outcome of a case such that the only possible reason for its involvement is to create jurisdiction"); *Bishop v. Hendricks*, 495 F.2d 289, 295 (4th Cir. 1974) (the critical issue is whether the "motive" for the representative's appointment did or did not "elevate his relationship to the litigation above the level of a nominal party").

**B.** The M&R asserts that the Fourth Circuit has "indicated that multiple factors are relevant to the application of Section 1359." M&R at 9. It relies principally on *Tee Feral Golf, LLC v. MJM Golf, LLC*, 2022 WL 17546943, at *1 (4th Cir. Dec. 9, 2022) (unpublished). That case involved an LLC formed more than a decade after the events at issue in the litigation, so it had no stake in the outcome except by operation of an "extremely suspicious" transaction. *Id.* at *2, *aff'g* 531 F. Supp. 3d 1108, 1114 (E.D. Va. 2021). To the extent the M&R suggests that *Tee Feral* overruled *Lester*'s two-part inquiry in favor of a "totality of the circumstances" test, that suggestion cannot stand. The Fourth Circuit has never adopted a free-form "totality of the circumstances" test, and— as the appellees' brief confirms in *Tee Feral*—the validity of such a test was not presented in that

18

appeal. Brief for Appellee at 28 in *Tee Ferral*, 2021 WL 4261013 (Sept. 15, 2021). Unpublished opinions are not binding precedent, and the Fourth Circuit's 2023 published opinion in *Bestwall* quotes *Lester's* two-factor test as good law. 71 F.4th at 180-81. The M&R erred by relying upon an unpublished case, rather than the Fourth Circuit's published opinions in *Bestwall* and *Lester*.

**C.** For their part, Defendants asserted that the LLC units transferred to Mr. Mao remained "community property" under California law. ECF 39 at 21. That assertion is both irrelevant and incorrect. It is irrelevant because the analysis does not turn on state law at all. *Kramer*, 394 U.S. at 829. The federal standard requires assessment of whether the plaintiff is a "straw party" with "no real stake in the outcome." *Bestwall*, 71 F.4th at 180-81. Nothing even remotely suggests that FSMS (or even Mr. Mao) is a straw party with no real stake in the outcome. Defendants' assertion is incorrect anyway because California enforces written interspousal transfers that use words like "I give to [my spouse] any interest I have in" an asset (like the assignment here does) and assesses their validity "without resort to extrinsic evidence." *See Estate of MacDonald*, 794 P.2d 911, 918-19 (Cal. 1990); Calif. Family Code §§ 850(a), 852(a). Even if it mattered, Defendants have mis-stated California family as to spousal transfers.

Defendants also asserted that the old Supreme Court cases are "outdated" and "no longer good law." ECF 39 at 13-17. Not so. In *Kramer*, the Supreme Court specifically and expressly stated that "we have no occasion to re-examine the cases in which this Court has held that where the transfer of a claim is absolute, with the transferor retaining no interest in the subject matter, then *the transfer is not 'improperly or collusively made,' regardless of the transferor's motive*." *Kramer*, 394 U.S. at 828 n.9 (emphasis added) (citing *Cross*, *South Dakota*, *Williamson*, and *Black & White Taxicab Co. v. Brown & Yellow Taxicab Co.*, 276 U.S. 518 (1928)). Lower courts must follow directly applicable Supreme Court cases unless they have been explicitly overruled by that

Court. *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023); *United States v. Brown*, 77 F.4th 301, 302 (4th Cir. 2023) (Heytens, J., concurring in the denial of rehearing en banc). That is doubly so here, where the Fourth Circuit cited such cases as good law in the wake of *Kramer. Lester*, 415 F.2d at 1106 n.11 (citing *Crawford*). To be sure, there *are* non-Fourth Circuit cases applying a multi-factor test. *E.g.*, *Alix v. McKinsey & Co.*, 470 F. Supp. 3d 310, 320 (S.D.N.Y. 2020) (asserting that "whether the assignor retains an interest in the subject matter is merely a factor to consider in the analysis"), *rev'd*, 23 F.4th (2d Cir. 2022). But the Fourth Circuit's two-factor test is different, has not been abandoned, and is thus binding here.

## CONCLUSION

The Court should not adopt the Memorandum and Recommendation and instead hold that it has jurisdiction over this case because 28 U.S.C. § 1359 does not apply.

This the 17th day of February, 2025.

<div style="display:flex;justify-content:space-between;">

*/s/ Kent A. Yalowitz*
Kent A. Yalowitz (admitted *pro hac vice*)
N.Y. State Bar No. 2188944
**ARNOLD & PORTER**
 **KAYE SCHOLER LLP**
250 W 55th Street
New York, NY 10019
212-836-8000
kent.yalowitz@arnoldporter.com

– and –

Eliseo R. Puig (admitted *pro hac vice*)
Colorado State Bar No. 49022
**ARNOLD & PORTER**
 **KAYE SCHOLER LLP**
1144 Fifteenth Street, Suite 3100
Denver, CO 80202
303-863-1000
eliseo.puig@arnoldporter.com

*/s/ Lex M. Erwin*
Lex M. Erwin
N.C. State Bar No. 34619
Kevin Y. Zhao
N.C. State Bar No. 53680
**MAYNARD NEXSEN PC**
227 W. Trade Street, Suite 2300
Charlotte, NC 28202
Telephone: (704) 339-0304
Facsimile: (704) 338-5377
lerwin@maynardnexsen.com
kzhao@maynardnexsen.com

</div>

*Counsel for Plaintiff FS Medical Supplies, LLC*

**CERTIFICATION**

Pursuant to the Court's June 18 2024 Standing Order regarding Use of Artificial Intelligence, the undersigned certifies that:

1.  No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line research sources WestLaw, Lexis, FastCase, and Bloomberg;

2.  Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

<div align="right">

*/s/ Lex M. Erwin*<br>
Lex M. Erwin

</div>